## HARVEY v. TEXAS & P. RY. CO.

(Circuit Court of Appeals, Fifth Circuit. January 12, 1909. Rehearing Denied February 2, 1909.)

No. 1,782.

1. MASTER AND SERVANT (§ 102*)—DEATH OF SERVANT—SAFE PLACE—DUTY TO PROVIDE.

A master is bound to exercise reasonable care to see that the place and instrumentalities provided for the servant's labor are such as will not expose him to unnecessary danger.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 173; Dec. Dig. § 102.*]

2. MASTER AND SERVANT (§ 101*)—SAFE PLACE.

A master is negligent as respects his servants unless the plant and appliances furnished are such as would commend themselves to a reasonably prudent man as reasonably safe under the circumstances.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 180, 181; Dec. Dig. § 101.*]

3. MASTER AND SERVANT (§ 286*)—DEATH OF SERVANT—SAFE PLACE—NEGLIGENCE—QUESTION FOR JURY.

Decedent, an engine hostler, was killed in defendant's roundhouse, while sitting in the cab window of an engine about to be taken to a coal chute, by his hips coming in contact with a large post supporting the roundhouse, and standing within about six inches of the engine cab as it passed. *Held* that, in the absence of evidence that the post could not have been set further from the track, the evidence did not show that defendant was free from negligence, as a matter of law, in failing to provide a reasonably safe place to work.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

4. MASTER AND SERVANT (§ 206*)—INJURIES TO SERVANT—ASSUMED RISK.

In the absence of statute, the servant assumes the risks and dangers which ordinarily attend or are incident to the business in which he voluntarily engages.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 550; Dec. Dig. § 206.*]

5. MASTER AND SERVANT (§ 288*)—INJURIES TO SERVANT—ASSUMED RISK—QUESTION FOR JURY.

A servant does not assume a risk, as a matter of law, which the master has negligently created by doing or permitting something to be done, or by omitting some precaution which, in the exercise of ordinary care, ought to have been taken.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

6. MASTER AND SERVANT (§ 288*)—INJURIES TO SERVANT—ASSUMED RISK—STATUTES.

Under Gen. Laws Tex. 1905, p. 386, c. 163, providing that a railroad employé shall not assume a risk of a defect or danger known to the defendant, or in case a person of ordinary care would have continued the service with knowledge thereof, a railroad engine hostler did not, as a matter of law, assume the risk of injury from a roundhouse post, negligently set too near the track, by which he was struck while sitting in the cab window with his hips protruding therefrom, as the engine was being taken from the roundhouse.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

166 F.—25

7. MASTER AND SERVANT (§ 289*)—DEATH OF SERVANT—CONTRIBUTORY NEGLI-
GENCE—QUESTION FOR JURY.

Decedent and a co-employé, who were engine hostlers in defendant's roundhouse, sat in the window of the cab of an engine as it was being taken to a coal chute where they were to load the tender. The hips of both protruded to some extent from the cab window, and, while decedent's fellow servant escaped, decedent's hips came in contact with a roundhouse post negligently set too near the track, and were crushed. *Held*, that decedent was not negligent, as a matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

8. MASTER AND SERVANT (§ 89*)—INJURIES TO SERVANT—SCOPE OF EMPLOY-
MENT.

Under the rule that a servant is deemed in his master's service whenever present to perform his duty and subject to orders, though at the given moment he may not be actually engaged in the performance of any given work, decedent, an engine hostler, who was injured while sitting in an engine cab window on his way to a coal chute about 200 yards from the roundhouse where he was to help coal the engine, was in the line of duty at the time he was injured, though he had no work to perform on the engine.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 89.*]

In Error to the Circuit Court of the United States for the Eastern District of Texas.

This action was brought by the plaintiff in error against the defendant in error to recover damages for negligently causing the death of her son, under a Texas statute allowing the mother to sue in such cases. The action was begun in a state court, and was removed on petition of the defendant to the court below on the ground that the defendant was a corporation under the laws of the United States. The plaintiff alleged in her petition that her son, W. S. Harvey, was in the employment of the defendant as a hostler's helper in and about the defendant's roundhouse. The place and circumstances of the accident were then alleged as follows:

One of the tracks entering said roundhouse, over which the engines of defendant passed in entering and coming out of said roundhouse, was so constructed and maintained by defendant that engines being operated and moved on said tracks passed between and very near, and in close and dangerous proximity to, posts or columns which stood upright about the entrance to the roundhouse, which said posts supported a portion of the roundhouse, and which were large, firm, and secure, and said posts were by defendant maintained and kept so close to said tracks that engines being operated on said tracks passed in dangerous and close proximity thereto, and would almost strike against said posts, and that there was barely room for the engines to pass between the posts, all of which facts and conditions were well known to the defendant company; and defendant company knowingly constructed, kept, and maintained said tracks and posts as aforesaid, and knowingly permitted them so to be and remain. The aforesaid conditions and surroundings were dangerous to the lives and safety of the defendant's employés, including said deceased, whose duties required them to operate and to be in and about defendant's engines while they were being operated in said roundhouse, and this the defendant company well knew; and the defendant was guilty of negligence in so maintaining the same, and in permitting the said tracks and posts to so be and remain. On the date aforesaid, one of the defendant's engines was in said roundhouse and was about to be moved out of the same over the track aforesaid, and the said W. S. Harvey, in the discharge of his duty and the performance of his services to the defendant company, was on said engine. Another of defendant's servants was in charge of and operating the said engine, and ran the same over the track and between the posts aforesaid, and said W. S. Harvey, having a portion of his body extending out

of the engine, was caught between one of said posts and the engine, and was thus mashed and crushed, and thereby received injuries from which he shortly died.

There were other averments of negligence on the part of the defendant not material to state, and averments of special damages.

The answer of the defendant set up three defenses: (1) That the defendant was not guilty of negligence: (2) that the deceased had assumed the risk of the danger whereby he had lost his life; and (3) that the deceased was guilty of contributory negligence whereby he lost his life.

The case was tried on these issues.

The facts may be best stated by giving the substance of the testimony of each witness:

D. George testified: "I knew W. S. Harvey, and remember the circumstance of his receiving injuries at the Texas & Pacific shops at Marshall, in December, 1905. I was helping hostle at that time. Mr. Harvey was helping hostle also. The hostler is supposed to be the man who takes the engine in and out of the roundhouse; he is an engineer, and we are supposed to help them. We were supposed to help take the engines to the coal chute and coal them up; that is, put coal on them and get them ready to go out on the road; that is what I mean by 'hostler helper.' I had been hostler helper since July of that year. Harvey was there when I went there. When Harvey was injured, I was working in that capacity, as was Harvey also. He was on engine No. 248 that was going to be used for the passenger train. As well as I remember, it was between 1 and 3 o'clock when he was injured. When I first saw Harvey on the engine, it was in the roundhouse. We were sitting there talking. Eli McGillery was the hostler or engineer; I was helping him. We were both, Harvey and I, sitting on the fireman's side of the deck of the engine. The engine was standing still when we first got on. Harvey was sitting in the front cab window, and I was sitting right behind him. The engine was moved backward. I was to the rear and he was to the front, both sitting in the cab window together, fronting in the direction of the boiler and of the engineer, and the engine was started backward to be taken out of the roundhouse, to go to the coal chute and be supplied with coal, and carried to the depot. We were both sitting in the window with our backs to the outside; the engine moving backward carried us sideways. I noticed nothing unusual in the way the engine moved out of the roundhouse, only that when it started Harvey was caught between the post and the cab window, and I noticed him and grabbed him and set him on the seat, and he fainted. We were sitting with our backs out the west window of the cab, toward the post; the engine was moving south, and as Harvey passed that post it caught him and mashed him against the cab window, between the cab window and the post. He never made any outcry, never spoke a word. We were sitting there talking, and I just happened to turn my head at the time it caught him. It caught him right through the hips. I set him down and he fainted. We were sitting there with our bodies partly stuck out of the cab line, back this way (indicating). I had my feet sitting up against the boiler head. I passed the post first. Harvey was sitting further out than I was, I suppose; if he was not, I would have been caught, too; it never even brushed me; I didn't feel it. It was an oak or pine post; I don't know which. It was stationary, a hard, substantial post. I suppose it was about 8x8, something like that. I don't know how near that cab passed to the post; I don't even know now. Judging from the position Harvey was in when he got caught, I should say it was six or eight inches from the cab window. I suppose the post had been there ever since the roundhouse has been built. My attention had never been called to the fact of its being so close before. When the accident occurred, I called to the hostler and told him he had hurt Harvey, and we took him off the engine and put him on a stretcher. After we got him off the engine, he came to his senses, and was then taken to the hospital. After they got him off the engine, I went on and supplied the engine with coal. We only had a short time, and we went ahead with our work. Harvey died three or four days after that. I know that roundhouse had been there several years. Those posts were there when I went there, and they were in the same position with

reference to the track. Harvey and I were sitting there with our bodies just over the window sill. That was not the usual way to ride. Of course, once in a while they will get up in there. Probably there is a little rest, and they had rather sit up there than on the seat box. Once in a great while the fireman and the hostler helper get up in there and ride around. We had our hips stuck out of the window, sitting on the window sill. The engine was standing still at the time we sat down. We remained sitting that way, and the engine was moved out to be taken to the turntable and turned around. The windows in the cab are for the purpose of giving breeze; they are also used to look out for signals and things of that kind. They are not used to protrude your body out, but to stick your head and shoulders out and look backward or forward, as the case may be; that is the principal use they are put to. I don't suppose your head and body would protrude from the window but mighty little in looking for and catching signals—just far ·enough to see them—just barely have to stick your head out. That was a straight track there. I had been there four or five months at the time of the accident. No other person had been hurt by this post or these posts up to that time that I ever heard of. This was my engine Harvey and I were on. McGillery was the hostler, and I was supposed to help McGillery. Harvey was on the engine with me. He didn't have any particular business on there. We were just sitting there talking; that was all we were doing. I was going to the coal chute to supply the engine with coal. Occasionally, Harvey and I worked together. We were not working together at that time. I don't know whether he had any idea of helping me coal up that engine at all; of course, once and occasionally we did help each other. Maybe once or twice a month I would assist him or he would assist me. I don't remember how long it had been since he helped me coal up my engine. (Witness was here shown a statement in writing). I wrote this; it is my statement. I don't remember what time I made the statement. It was sometime in Ft. Worth. It was the time Reese Harvey came to Ft. Worth to see me. I have read it over; and, after reading it, I will say that Harvey and I were sitting up there together at that time. Of course, we were figuring on working together at that time. This statement don't say anything about heretofore. We were figuring on working together at that time; I was figuring on him helping me work up that engine; I don't know what he was figuring on. We had to take the engine out of the roundhouse before coaling up. He had said nothing whatever about what he was going to do. He had done nothing toward taking the engine out. We got on the engine while it was standing still. That was the usual place for the hostler and the hostler helper to get on the engine, in the roundhouse where it is cleaned. The hostler helper is supposed to ring the bell and get ready to take the engine out. The engine is cleaned and got ready to go out on the road. The hostler and hostler helper take charge of it at that place and carry it to the coal chute, and coal and water it and get it ready for the road, and carry it over to the depot where it is to be used. I got on the engine that afternoon at the usual place. Harvey was up on the engine when I got on it. He carried his dinner that day, if I am not mistaken, or he got back before I did; at least, I found him on the engine when I got back from my dinner. There was nothing for us to do until we got ready to go to the coal chute. One of us was supposed to ring the bell when we were ready to move the engine, when the hostler was ready to move it. There was no physical work further than that until we got to the coal chute. We sat on the engine 15 or 20 minutes before the engine was ready to move. We were not waiting for anything particular; we were simply waiting for time to take the engine out. It was the duty of one of us to ring the bell. I rung it myself. The reason for our working together was to make the work lighter for each of us. The laborious work was coaling up the engine. The remainder of the work was principally signals, or watching for signals and seeing that everything was clear. We had been working together every once in a while ever since I had been there. I think I might state we did it once and occasionally. I had been there since the 12th of July, and I think probably we had worked together that way half a dozen different times up to that time. There was another hostler. I believe his name was Adams. He had

charge of another engine. My hostler had charge of that particular engine that afternoon. I don't know what the other hostler was doing at that particular time. I don't know whether he was doing anything or not. I have already stated all I can say about whether it was usual or frequent for me to help Harvey or him to help me. I don't know what Harvey was up there for at that particular time; he was not doing anything. He knew what was going to be done; he knew quite well that that engine went out to the passenger train. He knew the engine was to be coaled up. He knew it, because he had been there long enough to know when this passenger train went out, and what was to be done with that engine. I made this written statement in the presence of Reese Harvey, and I reduced it to writing and signed it myself. That was about January 15, 1906, in Ft. Worth, Tex. I said in this statement that we were working together so as to make the work lighter. That is true. I said we worked together once in a while. We probably might have been working together that day. He was on the engine. I don't know, but I guess he was figuring on helping me coal up that engine. I don't know what he was on there for, coming right down between man and man. I suppose that is what he was there for. To coal up this engine we had to go about 150 or 200 yards, and had to pass that post to get out of the roundhouse. I was in Mr. Jones' office some 10 or 15 days ago, when I made a statement which was taken down by a stenographer and reduced to writing. In that statement I said that it was the duty of the witness (deceased?) to assist in carrying this particular engine to the depot. 'Harvey assisted other hostlers, and it was not unusual, in fact it was frequent, that both Harvey and the witness rode on the engines from the roundhouse to the coal chute, where the engines were coaled up.' Yes, I said that: I made that statement; I said, 'from the roundhouse'; I didn't say, 'in the roundhouse.' It was not unusual or infrequent that the hostlers rode on the engines to the coal chute to coal them up; that is true; I made that statement. The reason for our working together in coaling up the engines was to make the work lighter and easier. I made that statement, and it was true then, and is true now. I had frequently gone to the coal chute and assisted in coaling up the engine—Harvey and I together; that was for the purpose of making the work lighter on both of us. I would go to his engine and help him, and he would go on my engine and help me. We would get on after the engine got out of the roundhouse, after the engine got off the turntable. The roundhouse is a covered shed, a kind of circular house with a roof over it. The tracks are laid out diverging in every direction from the turntable. The turntable is used to turn engines in the direction you want them to go. The turntable is about 20 or 30 feet from where Harvey and I got on the engine that particular day. It is the length of an engine. It was usual for Harvey to get on my engine after it got off the turntable out of the roundhouse. We didn't carry the engine to the coal chute together as much as we did singly; we did do it occasionally. At this particular time Harvey got on the engine in the roundhouse. I didn't mean to say that he got on the engine in the roundhouse a half a dozen times. I don't remember his ever getting on the engine in the roundhouse before while I was hostler helper. I don't remember ever getting on in the roundhouse myself. The only reason for getting on in the roundhouse was to see how the water was. There is no reason why we should not get on in the roundhouse that I know of. There is nothing to do until you get to the coal chute, unless you catch a signal, and to see that everything is running in shape. I think Harvey was helper for a hostler by the name of Adams. I was helper for McGillery. Adams and his helper worked at the same roundhouse. I didn't get any orders from anybody when there was an engine to take out. I just knew from rotation what to do. Harvey was supposed to be subject to Adams' call all the time. I was subject to McGillery's call. The engine was just barely moving when it caught Harvey; it had moved about five feet. I don't remember what Harvey and I were talking about; we were just joshing one another. It had nothing to do with our occupation. Harvey was working that day; he was on duty. The engines were kept in this roundhouse and prepared for duty, and were sent out from there to the coal chute to be equipped with coal for the road by the hostler and his helper."

R. R. Mingus testified: "I remember the occasion of W. S. Harvey receiving injuries from which he died, in December, 1905. I was roundhouse foreman at the time. Harvey was working under me as hostler helper. David George was hostler helper for McGillery, while Harvey was helper for Adams, I measured the distance from the post which struck Harvey to the cab window of the engine. My recollection is it was between six and seven inches. Harvey's duty was to coal up the engines, put water in them, and throw switches for the hostler. Harvey was subject to my orders. He knew from routine what his duties were. Only two men are supposed to be on an engine, a hostler and his helper. That is all that is necessary. Harvey was not on his engine as a part of his duty. It was his duty to help Adams, and McGillery was on that engine. I don't know where Adams was at the time Harvey was hurt. David George and Will Harvey were both hostler helpers, and it was the duty of each to coal up and water engines when they came out of the roundhouse to be prepared to take the road. There was no rule of the company, nor any objection on the part of the company, against Harvey helping George to coal up his engine in order to save time and lighten the work; there could not have been, and there was none. There was no objection to George helping Harvey. There was no objection to either helping the other to lighten the work, but it was not the practice for them to help each other. It was not the frequent practice. They practiced it to a certain extent, with my knowledge, of course. I observed them; it was with my consent; it was entirely proper; I could see no objection to their doing so. I did not object. I was foreman of the roundhouse. I don't know what you call 'frequent.' They did swap work once in a while. It might occur once a day, and then would not occur again for a week. They did it openly in the regular routine of their work, with my knowledge and approval, and without objection by anybody. I had been foreman of the roundhouse about a year and a half or two years. I measured the proximity of the post in question to a passing engine—that is, engine 248—since Harvey was killed. I measured from the window sill, right where Harvey was sitting. The reason I did not preserve the figures I made showing the distance was because I gave them to the office, and I supposed they preserved them. I made a memorandum of the distance and gave it to the master mechanic. I had noticed before this accident the proximity of this post to a passing engine; I had observed it for a year or two. The post remained in the identical position it was in when I came there; it had been there all the time. The company has about 10 or 12 engines of the same size as this 248. They went in and out of the roundhouse on this track and other tracks. There are 19 tracks in the roundhouse. The roundhouse is in a kind of crescent shape; the turntable is here (indicating), and there are 19 tracks diverging—coming into the roundhouse. Each of these tracks runs between posts. There is some difference in the distance between them; I don't know how much; I judge a couple of inches. I would not say there is more than a couple of inches. They are practically the same distance. There is perhaps that distance from each of the 19 tracks. I have known, as foreman of the roundhouse, that these posts were that close to the engines passing in and out. Engines were brought in the roundhouse for repairs after a trip on the road. I remember where I was when the accident occurred; I was in the office; I didn't see it. The hostler and helper had to go from the roundhouse to the coal chute in order to prepare the engine for the road. That is about 150 or 200 yards from the roundhouse. The helper usually rode on the engine from the roundhouse to the coal chute. It is pretty hard to say where they usually got on the engine. They got on sometimes at the table, sometimes in the roundhouse, and wherever it suited them. There was no stipulated place to get on; there was no rule about where they should get on the engine. It was entirely proper for the hostler helper to get on in the roundhouse before the engine was started to be moved onto the turntable."

E. A. McGillery testified: "I remember the occasion when Harvey got hurt in the roundhouse. I was hostler. Harvey was hostler helper; he was helping Adams. George was my helper. I didn't know any one was on my engine but George at the time of the accident. I was on the engineer's side of the engine, on the seat box, when the accident occurred. They were

on the other side of the boiler, on the left-hand side. The boiler comes clear back through the cab; it was between me and them. It comes up a little higher than my head, sitting down. From my seat I could not see these other two men on the other side. The first time I knew Harvey was hurt was when George ran around and told me that we had hurt him. I had got the engine out of the roundhouse and the tank on the turntable when I knew anything about it. George informed me he was hurt, and I stopped immediately and ran around there, and he was on the left-hand side laying in the cab. The engine was not moving fast. It had made only about two revolutions. I don't suppose it was going a mile an hour; it was as slow as an engine could be moving. I don't know how long George had been my helper. I believe that was the first day that month; I don't remember. My recollection is the accident occurred on December 15th, and that I went to hostling that morning. I don't remember whether I had hostled any during that month or not before this. I had hostled within two months, I know. I think I hostled all along through the month before the accident. I can't say how much I had done within the past two months; I didn't charge my mind with the number of days. This was the first day I had had Harvey with me that month. I can't say whether he had served with me the previous month or not. He helped other hostlers. I don't know how many hostlers there were; there were a good many extra men. I don't know how many regular hostlers—I believe two night and two day hostlers. I believe Adams and Cowan were the regular hostlers at the time of this accident. I don't mean to say that David George was the only man who was acting as helper. It was the duty of the hostler helper to go out with the engine to the coal chute and get water and coal. I can't very well say whether or not it was the common or frequent practice, when they had that duty to perform and the other helper was not actually engaged at the moment, for him to help do the work in order to make it lighter; I can't say whether it was or not. It did not commonly occur between David George and Will Harvey, not that I remember. The only time I remember was when Harvey was killed. There was no objection to it. I don't say it did not frequently happen; I say I didn't notice it. I paid no particular attention to it. There was no objection to it that I know of. I know of no reason why there should be objection to it. The hostlers generally get on the engine in the roundhouse; they are supposed to get on there. I knew these posts were close to the tracks. I didn't know how close they were; I don't know now how close they are. They are six or eight inches, I should judge, but this is only an estimate. I got to Will Harvey immediately after I was notified that he was hurt, and he was then laying in the cab unconscious."

Mrs. Amanda Harvey testified: "W. S. Harvey was my son. He is dead. He died December 18, 1905, in the hospital at Marshall, Tex. He is the one Mr. George has been testifying about. He died in the hospital from his injuries which Mr. George has testified about. He was hurt on December 15th, about 10 minutes after 1 o'clock, and died the 18th. He was injured on the left side, from the spine around on his side, and his hip was all mashed, and his left side. I think his kidneys were mashed, but no bones were broken. He was in very good health prior to that. I am a widow. My family was composed of W. S. Harvey and Reese Harvey, my two sons, and myself. W. S. Harvey was 28 years old, lacking a few days. At the time he was hurt, I was 62 years old. He was making $50 per month, sometimes more; and he gave me half of his wages. He was unmarried."

The court directed the jury to return a verdict for the defendant, and the plaintiff duly excepted. On the verdict so returned, judgment for the defendant was entered, and the case is brought here on writ of error, the plaintiff having assigned that the court erred in directing the verdict.

Cone Johnson, Jas. M. Edwards, and S. P. Jones, for plaintiff in error.

F. H. Prendergast (W. L. Hall, of counsel), for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge (after stating the facts as above). 1. It is a general rule that the master must provide a reasonably safe place for the servant to work. He is not an insurer of his servant's safety, but as to the place of labor and the instrumentalities furnished, the master is bound to exercise such care as a prudent man would exercise under the circumstances, and he must see to it that the instrumentalities are not such as will expose the servant to unnecessary danger. It follows that the master is in default as respects his servants unless the plant and appliances furnished are such as would commend themselves to a reasonably prudent man—"such as a prudent man would furnish if his own life were exposed to the danger that would result from unsuitable or unsafe appliances." The doctrine is now unquestioned that the master is obliged to furnish adequate and reasonably safe appliances and premises with c⁻ in which the servant is required to perform his duties. 1 Labatt on Master and Servant, § 22a. The difficulty is not in ascertainng the principle, but in its application.

The plaintiff's son was killed in the defendant's roundhouse by the defendant's engine. The deceased was riding on the engine, and was crushed against one of the posts that supported the roundhouse. The post stood so close to the track that it came within about six inches of the engine cab as it passed the post. It does not appear from the record that it was necessary that the post should be so close to the track in order to serve its purpose as a part of the roundhouse. The record reveals nothing to forbid the inference that the post could have been placed at a greater distance from the track and still have served the same purpose.

It has been frequently held, and seems consonant with sound reason, that negligence may be imputed to a master whenever an instrumentality, plant, or place of business furnished by him is of such a character that his servant is subjected to unnecessary dangers, or to danger greater than is reasonable or proper. 1 Labatt on Master and Servant, § 23. This doctrine has been applied in holding a railway company guilty of negligence where it allowed a switchstand to be so near a track that it extends to within "9 or 10 inches of passing cars" (Pidcock v. U. P. Ry. Co., 5 Utah, 612, 19 Pac. 191, 1 L. R. A. 131); where a telegraph pole was allowed to stand within 12 inches of a passing car (Hall v. U. P. Ry. Co. [C. C.] 16 Fed. 744); where a stock chute was within 5 to 7 inches of a freight car as it passed (Keist v. Chi. G. W. Ry. Co., 110 Iowa, 32, 81 N. W. 181); where a telegraph pole stood so near the track that it cleared the passing car only 20 inches (Crandall v. N. Y., N. H. & H. R. R. Co., 19 R. I. 594, 35 Atl. 307); where a projecting rock was allowed to remain near enough the track to endanger a brakeman on a ladder at the side of a passing car (Ga., Pac. Ry. Co. v. Davis, 92 Ala. 300, 9 South. 252, 25 Am. St. Rep. 47); where a switch at a height of 2 feet reached within 7½ inches of a passing engine. (Colf v. Chi., St. P., M. & O. Ry. Co., 87 Wis. 273, 58 N. W. 408); where a trestle stood within 14½ inches of a passing car (Robel v. Chi., M. & St. P. Ry. Co., 35 Minn. 84, 27 N. W. 305); where a switch reached within 9 inches of a passing

car (Sou. Kan. Ry. Co. v. Michaels, 57 Kan. 474, 46 Pac. 938); and where a switchstand was "too near the track" (Bonner v. La None, 80 Tex. 117, 15 S. W. 803).

It is not only the duty of the master to construct a safe plant or to have safe premises, but it is his duty to keep them safe. A structure too near the track may be permitted to stand for years without attracting attention until some unfortunate accident occurs. But this does not relieve the railroad company of the charge of negligence in so constructing the road, or in permitting it to remain in a condition dangerous to the safety of the servant. Wood v. L. & N. R. R. Co. (C. C.) 88 Fed. 44. If a post is unnecessarily too near the track for safety, it should be moved. The fact that it is a part of a permanent structure may add to the expense of the change, but the question of cost is insignificant "when weighed in the balance against peril to human life." L. & N. R. R. Co. v. Hall, 91 Ala. 112, 123, 8 South. 371, 375, 24 Am. St. Rep. 863. See, also, C., O. & G. R. R. Co. v. McDade, 191 U. S. 64, 66, 24 Sup. Ct. 24, 48 L. Ed. 96.

Waiving other questions for consideration later, we are of opinion that the case could not properly be taken from the jury on the ground that there was no evidence showing, or from which the jury might infer, that the defendant company was negligent in permitting the post to stand so near the track.

2. In the absence of a statute changing the rule at common law, it is implied in the contract of hire that the servant risks the dangers which ordinarily attend or are incident to the business in which he voluntarily engages for compensation. But in affirming this doctrine, the Supreme Court has said:

"It is equally implied in the same contract that the master shall supply the physical means and agencies for the conduct of his business. It is also implied, and public policy requires, that in selecting such means he shall not be wanting in proper care. His negligence in that regard is not a hazard usually or necessarily attendant upon the business. Nor is it one which the servant, in legal contemplation, is presumed to risk, for the obvious reason that the servant who is to use the instrumentalities provided by the master has, ordinarily, no connection with their purchase in the first instance, or with their preservation or maintenance in suitable condition after they have been supplied by the master." Hough v. Railway Co., 100 U. S. 213, 217, 25 L. Ed. 612.

It follows that a risk which the master has negligently created by doing or permitting something to be done, or by omitting some precaution which, in the exercise of ordinary care, ought to have been taken, cannot be regarded as one of the ordinary risks of the employment which the servant, as matter of law, is presumed to have assumed. 1 Labatt on Master and Servant, § 270; Ford v. Fitchburg R. R. Co., 110 Mass. 240, 14 Am. Rep. 598. And this doctrine has been applied to cases where permanent objects were permitted to stand needlessly and dangerously near to a railroad track. Murphy v. Wabash R. R. Co., 115 Mo. 111, 125, 21 S. W. 862; Pikesville, etc., R. R. Co. v. Russell, 88 Md. 563, 42 Atl. 214.

But we need not examine this defense further as a question at common law, nor consider the effect of deceased's knowledge or want of knowledge of the defect, for there is a statute of the state of Texas

which is applicable on this point. For convenience of reference, it is copied in the margin.[1]

The effect of this statute is that, if it be found that the death of the deceased was caused by the wrong or negligence of the defendant, and if the defendant knew of the defect and danger; the plea that the deceased had assumed the risk could not prevail; nor could such plea prevail if the facts were such that "a person of ordinary care would have continued in the service with the knowledge of the defect and danger." Even if the facts were such that at common law the deceased would have been held to have assumed the risk, this statute, on the evidence in the record, would forbid the trial court to instruct the jury peremptorily to find for the defendant on the plea of assumption of risk.

3. We come now to the question of contributory negligence. There are many cases in the state courts and the lower federal courts which show reluctance in submitting controverted facts, or facts from which different inferences may be drawn, to a jury when the action involves questions of negligence and contributory negligence in a suit by a servant against the master growing out of personal injuries. Labatt says that:

"The American courts * * * have gone to such extreme lengths in controlling and setting aside verdicts that it seems to be often difficult, if not impossible, to acquit them of ignoring altogether the true boundary line between their own functions and those of juries." 1 Labatt on Master and Servant, § 330.

Beven shows that there was the same tendency in the lower courts in England, caused, he suggests, by the fact that some judges were "impressed with the frequently unjust decisions of juries in favor of injured people against wealthy corporations." 1 Beven on Negli-

---

[1] Be it enacted by the Legislature of the State of Texas:

Section 1. That in any suit against a person, corporation or receiver operating a railroad or street railway for damages for the death or personal injury of an employé or servant, caused by the wrong or negligence of such person, corporation or receiver, that the plea of assumed risk of the deceased or injured employé where the ground of the plea is knowledge or means of knowledge of the defect and danger which caused the injury or death shall not be available in the following cases:

First. Where such employé had an opportunity before being injured or killed to inform the employer or a superior entrusted by the employer with the authority to remedy or cause to be remedied the defect, and does notify or cause to be notified the employer or superior thereof within a reasonable time, provided it shall not be necessary to give such information where the employer or such superior thereof already knows of the defect.

Second. Where a person of ordinary care would have continued in the service with the knowledge of the defect and danger, and in such case it shall not be necessary that the servant or employé give notice of the defect as provided in subdivision 1 hereof.

Sec. 2. The fact that there is now no adequate law protecting employés on railroads in their employment from damages in operating defective machinery creates an emergency and an imperative public necessity that the constitutional rule which requires bills to be read on three several days in each house be suspended, and said rule is hereby suspended, and this act.shall take effect and be in force from and after its passage, and it is so enacted.

Approved April 24, 1905.

Gen. Laws Tex. 1905, p. 386, c. 163.

gence, 148. But the House of Lords in England, and the Supreme Court in this country, have endeavored to correct this tendency, and have indicated that these cases, like others with disputed facts or facts subject to different inferences, should be submitted to the jury. 1 Beven on Negligence, 119, and cases there cited; Jones v. E. T. V. & G. R. R. Co., 128 U. S. 443, 9 Sup. Ct. 118, 32 L. Ed. 478.

It was the duty of the enginemen, or hostlers, to move the engines in and out of the roundhouse. Harvey, the deceased, was a hostler's helper. It was his duty to help "coal" the engine at the coal chute, and to help the hostlers in moving the engines. He got on the engine in the roundhouse, and was with D. George, who was also a hostler's helper. Harvey and George sat down in the cab window, with their faces toward the inside and their backs toward the outside. Sitting this way, their hips protruded from the window. The engine was moved backward very slowly, and was to be backed only a short distance. His conduct is not to be measured by rules applicable to fast travel on an ordinary train. Denver & B. P. R. T. Co. v. Dwyer, 20 Colo. 132, 136, 36 Pac. 1106. George was sitting beside the deceased, but nearer the rear end of the cab. As the engine backed, George passed the post first and in safety, but Harvey was caught between it and the cab window, and killed. Mingus, the roundhouse foreman, measured the distance from the window to the post, and gave the memorandum made by him at the time to the master mechanic. This memorandum was not produced, but Mingus said that the distance of the post from the window was "somewhere between 6 and 7 inches." The windows were at times used as places through which to receive signals given by defendant's servants to the hostler moving the engine. To receive signals, it was often necessary for the one receiving them to protrude somewhat beyond the side of the cab. The most critical mind finds nothing in the conduct of the deceased to criticise as reckless or imprudent or negligent, unless it be the fact that he sat in the window. George also sat in the window and passed the post in safety, and one would hesitate to say that all fair-minded men would hold that his act showed a want of ordinary care. The record does not show the width of the window sill, nor does it show the width of the engine, nor how much wider it was than the other engines generally in use there. It is shown that the post that struck Harvey stood nearer to the track than other posts to other tracks in the roundhouse, but it is not shown exactly how much nearer. The memorandum of the measurement not being produced, it is not certainly shown how close the post in question stood to the track. In this condition of the proof, it is a matter of inference as to what extent Harvey's person protruded beyond the line of the cab. It is only certain that he sat in the window and was struck by the post.

Does the fact that the deceased sat in the window, in view of all the other evidence, show a want of ordinary care? Was the act so clearly significant of negligence that, taken with all the evidence, no other inference could be reasonably drawn from it? If it be assumed that the deceased knew the proximity of the post and the danger his position put him in, no one could deny that his action was

reckless; but to assume that he had knowledge of the peril caused by the post and the breadth of the cab would be to ignore the instinct of a man to protect his own life, and also to ignore his right to assume that the road was so constructed as to be reasonably safe to servants who gave or received signals from the window. Can it be that all reasonable men would infer from the evidence that the deceased had knowledge of the facts and the danger, and, with such knowledge, assumed the position of peril? Unless he is chargeable with knowledge of the danger, he is not chargeable with negligence. Contributory negligence is "predicable only where the servant understood the conditions and the resulting dangers"; and the learned author adds, "the case is always for the jury if it is not a necessary deduction from the evidence that he did understand those conditions and those dangers." 1 Labatt on Master and Servant, § 330.

Riding on cars, and the position, whether standing or sitting, of the servant or passenger so riding, relates to conduct in the ordinary affairs of life, and, when the prudence or recklessness of such conduct is in question, it is a matter of ordinary reasoning which may be properly and justly left to the jury. 1 Beven on Negligence, 149. To a judge who may not have had experience from observation of the ordinary conduct of young workmen riding on engines, the position taken by the deceased may seem not only wanting in dignity, but in ordinary prudence, while to a jury of 12 men coming from different walks in life, probably familiar from observation or experience with the ordinary habits and manners of men under the circumstances involved, the act of the deceased in taking his seat in the window of the cab, considered in the light of all the evidence, might not appear necessarily imprudent nor wanting in ordinary care.

In analogous cases there are many opinions and expressions of courts of high authority tending to support our conclusion that in a case like this the question of contributory negligence is for the jury. We refer briefly to a few of them. In Coughlan v. Cambridge, 166 Mass. 268, 44 N. E. 218, the plaintiff, who sued for personal injuries, got on the car, and, the floor of the car being wet, he sat on the edge of the car, with his feet inside, holding on with both hands, until thrown off and injured in consequence of the car's passing rapidly over a switch and then coming to a sudden stop. The court, without dissent, said, "We cannot say that his manner of riding was negligent." In Johnston v. Oregon S. L. Ry. Co., 23 Or. 94, 31 Pac. 283, it was held that the question of contributory negligence was for the jury, where a switchman was killed while riding upon a ladder on the side of a car past a switch pole but 20 inches from the wall of the car and 4 feet from the track. In Brown v. Sullivan, 71 Tex. 470, 476, 10 S. W. 288, where the woman injured was standing in the door of a car, the question of her negligence was held to be for the jury. In Pennsylvania R. R. Co. v. Zink, 126 Pa. 288, 17 Atl. 614, the servant put his left foot into the iron stirrup at the right-hand side of the front end of the front car, his right foot on the bumper, and one of his arms over the side of the box of the car to hold himself on. The car, which was being pushed to a siding about 300 yards distant, was

running at a speed of 5 or 6 miles an hour. It was derailed, and the servant was killed against a pile of lumber 20 to 40 inches away from the side of the car. The court held that the question of the decedent's contributory negligence was for the jury. In Northern Pacific R. R. Co. v. Egeland, 163 U. S. 93, 98, 16 Sup. Ct. 975, 41 L. Ed. 82, it was held that, in jumping from a train going about four miles an hour, the servant being injured thereby, his negligence is not so obvious as to be a necessary legal conclusion, but is a question for the jury. In Washington & G. R. R. Co. v. Harmon, Adm'r, 147 U. S. 571, 580, 13 Sup. Ct. 557, 560, 37 L. Ed. 284, Mr. Chief Justice Fuller, commenting on the conduct of one who stood on the platform, "or even upon the steps," said that it "might not be negligence in all cases, and certainly not negligence in law. * * *"

The case of Texas & Pacific Ry. Co. v. Johnson, 106 S. W. 773, decided by the Court of Civil Appeals of Texas, should be considered for more reasons than one. There, plaintiff's action against the railroad company was sustained on facts very much like the case at bar. The post of the roundhouse stood within five inches of the passing engine, and the servant in charge of the engine had his head crushed between the cab and the post. He, of course, had his head out beyond the line of the side of the cab, otherwise he would not have been killed. It appears from the opinion of the court that he may have put his head out to receive and transmit a signal; "or, it may be, he only wanted to see what the machinist was doing, and thus ascertain when the foreman would probably cease the operation of the engine and turn it over to him." The learned attorney for the defendant company contends that the Johnson Case does not apply here, because the servant in that case leaned out of the window in the performance of a duty, but that Harvey, the servant in the case at bar, was not shown to have been looking for signals. That is true, and, while it makes a difference between the two cases, it cannot excuse the negligence, if it is proved, of the defendant, nor does it deprive the deceased of the protection of the law if he was in the exercise of ordinary care. The difference in the cases cannot properly take the one at bar from the jury, if Harvey had the right to assume that it would be safe to lean out of the window to give or receive signals. It is not probable that he protruded from the cab as much in sitting in the window as one would protrude from it in giving or receiving signals. The same distinction and contention was pressed on the court in Kansas City, M. & B. R. R. Co. v. Burton, 97 Ala. 240, 255, 12 South. 88, 95, and the court held:

It is "common knowledge that on freight trains, there being frequent occasions for the communication of signals from different parts of the train to the engine and no other practicable means to this end, it is often necessary for employés to extend their persons beyond the surface of the cars to give such signals. In view of all of this, the assurance of safety in being on the sides, or beyond the surface of such cars, which is imported thereby, the consequent idea of the absence of danger from such position which must naturally be engendered among employés, *we cannot say that an employé is negligent in extending his person beyond the car, even when under the immediate circumstances it is not necessary for him to do so in the discharge of his duties,* unless he knows of obstructions, or has reason to believe there are obstruc-

tions, which inject an element of danger beyond the ordinary into the situation." (Italics ours).

We are of opinion that the learned trial judge was not authorized to direct a verdict for the defendant on the ground that, as a matter of law, the deceased was guilty of contributory negligence.

4. The learned counsel for the defendant contends that the deceased, at the moment of the accident, "had no duty to perform on the engine, and merely boarded it to be carried down to the coal chute, at which place his duty called him to assist in coaling the engine." It is true that he was not engaged in the performance of any work at the moment he was struck. The evidence tends to prove, or, at least, the inference is permissible, that he was not only on the way to the place where he was to work, but that he was subject to orders, and was ready to help, if needed, in the moving of the engine. The evidence tends to show he was on duty. He was on his way to the coal chute about 200 yards distant, where he was to help in putting coal on the engine, and had mounted the engine, as was usual, or, at least, as was not unusual, in the roundhouse, to go on it to the coal chute. We are of opinion that the servant should be deemed in the master's service whenever present to perform his duty and subject to orders, although at the given moment he may not be engaged in the actual performance of any work. East Line & Red River R. R. Co. v. Scott, 71 Tex. 703, 10 S. W. 298, 10 Am. St. Rep. 804; St. L., A. & T. Ry. Co. v. Welch, 72 Tex. 298, 10 S. W. 529, 2 L. R. A. 839. "They also serve who only stand and wait."

The judgment is reversed, and the cause remanded for a new trial.