# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS
# THE CIRCUIT AND DISTRICT COURTS
# AND THE COMMERCE COURT

---

## WILLIAMSON v. BERLIN MILLS CO.

(Circuit Court of Appeals, First Circuit. September 5, 1911.)

### No. 908.

**1. WITNESSES (§ 37*)—COMPETENCY—KNOWLEDGE.**

On an issue as to a master's alleged negligence in using a particular vibration collar on a shaft in a paper mill, it was not error, as a matter of law, to refuse to permit a witness to state whether a specimen collar shown him was in general use, and what kind of collars were in general use; he having testified that his knowledge was limited to the practice in three mills where he had worked, and there being nothing otherwise to show that he possessed knowledge regarding the general practice called for.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 80–87; Dec. Dig. § 37.*]

**2. MASTER AND SERVANT (§ 284*)—DEATH OF SERVANT—ACTS—QUESTION FOR JURY.**

In an action for the death of a servant by his clothing becoming caught by a revolving shaft or vibration collar thereon, evidence *held* to justify submission to the jury of the question whether decedent was in the line of his duty when injured or was attending to matters of his own concern.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 284.*]

**3. MASTER AND SERVANT (§ 89*)—INJURIES TO SERVANT—SCOPE OF EMPLOYMENT—PLACE.**

A servant, though in a place where his duty requires him to be, may nevertheless so conduct himself at the time of injury as to be outside of the scope of his employment, so as to relieve the master from liability.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 153–156; Dec. Dig. § 89.*]

**4. TRIAL (§ 296*)—MISLEADING INSTRUCTIONS.**

Instructions that, if decedent went down into or towards the vat, near which he received injuries from which he died, and stepped on the edge of a storage tank to discuss the result of the decision in a certain case, and in going there went where it was not his duty to go and for a purpose not contemplated as part of, nor incidental to, the discharge of his duty, he went at his own risk, and could not recover, and if he was through with his work, and went down to the place where he was injured for a purpose in no sense connected with his duty, he went there at his own risk, and, if injured, his administratrix could not recover, were not objectionable, as misleading the jury to believe that decedent,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

190 F.—1

in order to have been in the line of his duty, must have been actually performing some service at the very time of the accident; the court having further charged that if he was going along by the vat in the performance of his duty, and incidentally stepped or momentarily halted to talk about the trial in question, it would not be such a complete departure as would prevent a recovery as a matter of law.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–713; Dec. Dig. § 296.*]

In Error to the Circuit Court of the United States for the District of New Hampshire.

Action by Maria Williamson, as administratrix of the estate of William Williamson, deceased, against the Berlin Mills Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Jesse F. Libby and Herbert I. Goss, for plaintiff in error.

George F. Rich (Rich & Marble and Drew, Shurtleff & Morris, on the brief), for defendant in error.

Before COLT, Circuit Judge, and BROWN and DODGE, District Judges.

DODGE, District Judge. The jury found for the defendant, and the plaintiff excepted to certain instructions in the charge. The plaintiff also excepted to the exclusion of certain evidence on her behalf at the trial. We consider first the exception which relates to the exclusion of evidence.

Plaintiff's intestate, William Williamson, was killed on February 11, 1908, in a paper mill at Gorham, N. H., belonging to the defendant, wherein he was at the time employed as an oiler. During the period of his employment, and during the hours within which he was expected to be performing his duties, his clothing became in some way entangled by a revolving shaft or the vibration collar thereon. He was thereby carried around the shaft and fatally injured.

The declaration alleged, among other things, that the defendant's machinery, tools, and appliances were unsafe, unguarded, and defective, "by reason of certain set screws and bolts projecting from an iron collar attached and fastened to the revolving shaft," and that by reason of the defendant's negligence in providing and using such defective shaft, collar, projecting bolts, and set screws unguarded her intestate was caught by said screws and bolts projecting from the iron collar and thereby injured as above. The alleged defects and negligence were denied by the defendant.

Upon the questions whether the vibration collar referred to was unsafe, or whether it was negligence to use such a collar, the plaintiff called as a witness one McLaughlin, who testified that he had worked for a considerable time in the mill where the accident occurred, had also worked in other paper or sulphite mills in Livermore Falls, Me., and in Lincoln and Portsmouth, N. H., for various lengths of time, and that at the Portsmouth mill he had been superintendent from 1903 to 1905, having the duty of overseeing the whole plant and reporting anything unsafe. He further testified that in the places where he had

worked he had had occasion to observe machinery, shafting, etc., and been apt to notice shafting in nearly all forms. Asked if he knew what kind of vibration collars were in general use on shafting, his answer was that he did, so far as his experience had been, in mills which he had been in; i. e., two mills in New Hampshire and one in Maine, within the previous five or six years. He stated that in paper and pulp mills there were different systems of machinery, shafting and the like, that the same kind of system would be similarly located, and that the general arrangement of machinery in regard to the shafting driving it, the kind of machinery used, and the place where it was located was similar in all the mills referred to.

[1] The plaintiff asked this witness to state whether a specimen collar shown him was in general use, and what kind of collars were in general use. The court excluded these questions, ruling that the witness was not shown to be qualified to state what was in general use.

The plaintiff contends that, although the witness could only have stated what collars were used in the particular mills wherein he had worked, he ought to have been allowed to answer the question, because his answer would have tended to show the kind of safety collars which other men of ordinary prudence and caution, engaged in a similar business, were accustomed to use, and would thus have been some evidence of what could have been and ought to have been done by the defendant. For the purpose suggested the general practice of other employers in similar lines might no doubt have been shown, so far as it related to shafting situated as this was, not out of reach, but where persons moving about the mill might get too near it. A witness, however, who professed knowledge only of the practice in certain mills where he had worked, and was not otherwise shown to possess knowledge regarding the general practice referred to, was not manifestly competent to testify regarding it. We cannot say that the ruling upon the preliminary question as to the witness' qualification was clearly erroneous as matter of law. And, if not, we must regard it as conclusive, according to the ordinary rule. Stillwell, etc., Co. v. Phelps, 130 U. S. 520, 527, 9 Sup. Ct. 601, 32 L. Ed. 1035. A vibration collar produced by this witness, claimed to be safer than the vibration collar which caused the accident, was said by him to have been in use where he had worked, and to have been available, and this part of his evidence the jury were permitted to consider. We are unable to sustain the exception whereon the first assignment of error is based.

[2] The instructions claimed to have been erroneous related to the question whether Williamson was in the line of his duty when injured. The plaintiff, in her second assignment, asserts that it was error to submit this question to the jury at all, because there was no evidence to justify a finding in the negative.

The case went to the jury upon the plaintiff's evidence, at the close whereof the defendant rested without calling witnesses. There was thus no conflict of evidence as to the facts.

There was no dispute that the relation of master and servant existed between the defendant and Williamson; that his place of service

was in the ground woodroom of the defendant's mill; that he went to the mill at the appointed time on the day he was killed, and entered upon the performance of his duties there in the usual manner; that when not otherwise employed it was his duty to be "around the filters" in the room above mentioned; or that he was "around" those filters at the time of his death. The plaintiff contended that, if all this was true, Williamson must be regarded as in the line of his duty when injured, however he may have happened to be occupied at the particular moment. The defendant contended that certain further facts in evidence showed him not to have been in the line of his duty at the time.

The facts in evidence here material may be stated as follows: Williamson's duties were to oil the machinery of certain grinders on the floor of the room above mentioned whenever necessary, and when not engaged in that work to be in a part of the same room elevated some 15 feet above its floor, where certain filters were located, in order to watch their operation, regulate the flow of water into and out of them from storage tanks below them, and oil the machinery connected with them as required. There were five of these filters in line, 5 feet or more apart, each consisting of a vat wherein a cylinder was rotated by machinery placed between it and the next vat. Power was communicated to this machinery by means of five belts, connecting the rotating apparatus of each vat with a long countershaft revolved by other machinery and running parallel with the line of vats at a level somewhat above them and at a distance from them, measured horizontally, of about 25 inches. The countershaft was 58 feet long, and at one end, opposite the filter at that end of the row known as "No. 5," it carried the vibration collar said to have caused Williamson's injury.

Williamson's oversight and regulation of the filters and their operation involved cleaning the rotating cylinders in them, as required, by using appliances connected with them for the purpose. His duties regarding the filters required him to be at them or near enough to them to watch what went on in or about them, when he was not oiling the grinders, or going down to or coming up from them. Stairs from the floor on which they were gave access to the elevated part of the room where the filters were, at the end of the line of filters, and nearest the No. 5 filter above mentioned. From them a walk or platform ran along the line of filters on the side furthest from the countershaft, and across from it at each end of the line to a parallel walk beyond the countershaft. This platform ran at a level some 18 inches or 2 feet below the tops of the filter vats and 42 inches below the level of the countershaft. In the space inclosed by the platform were contained the filters with the machinery which rotated their cylinders, the connecting belts, and the countershaft itself, together with other machinery or appliances not requiring special mention. There was no platform or walk within this space. It could be entered from the platform on one side by stooping under the countershaft, from the platform on the opposite side by getting between the filter vats, or from the platform at either end by going between the countershaft and the filter vat at that end. It was sometimes thus entered by men perform-

ing Williamson's duties. Passage along it between the filters and countershaft was obstructed by the connecting belts referred to, when in operation. Most of the duties required of Williamson at the filters were performed from the platform described.

On the day of the accident there were only four of the five filters requiring any care or attention from him. The No. 5 filter was out of operation, and the belt connecting its machinery with the countershaft had been removed. Repairs were being made on the cylinder in its vat by two millwrights. Williamson had no duties in connection with their work.

There was no witness who actually saw the accident happen, but immediately before it happened, and when he was last seen uninjured, Williamson was in the space between the No. 5 filter and the revolving countershaft, where there was no platform, and only a few boards put there temporarily by the millwrights, having no implement of work in his hands, and engaged in conversation with the millwrights then working on that filter. He was leaning as he talked on the vat belonging to the filter and standing on the edge of the storage tank below it, which edge was three or four inches wide. In this position the revolving countershaft and collar were only a few inches behind his back and not far above the level of his shoulders, so that he would be likely, unless he were careful, to get against them when he stood or straightened up. His conversation with the millwrights, so far as appeared, had no relation to his duties or anything connected with the mill, but was about the then recent "Thaw trial." When last seen before getting into the position described, he was on the walk or platform beyond the countershaft, wiping oil from an oil can in his hands. It would have been possible to go between the filters and the countershaft from where he stood while leaning on the No. 5 tank to the No. 4 filter, which, being in operation, was one of those which it was part of his duty to watch.

Men performing Williamson's duties had no particular place provided for them to sit or remain in, and were not required to stay in any particular place while "around the filters." Nor were any instructions given them as to the method of doing their work. Each was left to select the time for doing the various things called for by his duties and the manner of approach to the particular places which his duties made it necessary for him to visit from time to time.

There was no direct evidence as to Williamson's purpose in leaving the platform, stepping down into this position between the No. 5 filter and the countershaft, and remaining there as stated. It may therefore be conceded, as the plaintiff urges, that the jury might have found that he went there either to proceed on his rounds of oiling, or to ascertain the amount of water in the No. 5 tank, or to watch the work on the No. 5 vat, and thus learn when he could use that filter. They could so have found only by inference from the circumstances shown. We think it clear that they might equally well have found, by the like process, that he did not go to or remain in the position described for any of the purposes suggested, or any purpose connected with his duties, but was, for the time being, interrupting

the performance of those duties and staying in a place of danger merely for a purpose of his own, not contemplated as part of his duties and not incidental to them.

The question was rightly left to the jury, unless it can be said, as matter of law, that there was no evidence upon which the latter finding could have been made. The instruction to that effect, which the plaintiff requested, could have been justified only upon the plaintiff's theory that Williamson could not have been outside the line of his duty so long as he was "around the filters" with which his duties in that part of 'he room were concerned.

[3] We cannot accept this theory as sound. Though in a place where his duty requires him to be, a servant may nevertheless so conduct himself as to be outside the scope of his employment, as, for example, if he undertakes, while there, work different from that which he is hired to do, without orders or permission from his employer. It may be admitted that actual performance of work at the given moment need not be shown, and that, had nothing else appeared, except that Williamson was "around the filters" subject to orders and ready for any work incumbent upon him at any time, there would have been nothing tending to show him outside the line of his duties. Harvey v. Texas, etc., Co., 166 Fed. 385, 398, 92 C. C. A. 237. We think, however, that what did further appear as to his position and occupation at the given moment forbade the instruction requested by the plaintiff and required the course taken by the learned presiding judge. The question is one for the jury in most cases. Labatt, Master and Servant, § 634.

[4] The third and fourth assignments of error relate to the instructions which were given in submitting the question to the jury. In substance these instructions were that, if Williamson went down into or toward the vat and stepped on the edge of the storage tank to discuss the result of the decision in the Thaw case, and in going there went where it was not his duty to go, and for a purpose not contemplated as part of nor incidental to the discharge of his duty, he went at his own risk and could not recover, and that if Williamson was through with his work, and went down into this place for a purpose in no sense connected with his duty, he went there at his own risk, and, if injured, his administratrix could not recover, because he was not injured while in the line of his duty.

These instructions are objected to on the alleged ground that they amounted to laying down the doctrine that in order to be in the line of his duty a servant must at the very time of the accident be actively performing some service. But the jury were also instructed that if Williamson was going along by the vat in the performance of his duty, and if his stop at the vat was an incidental side step or momentary halt for the purpose of making a little talk about the Thaw trial, it would not be such a complete departure as to prevent recovery as matter of law. In view of this instruction, we cannot suppose the jury to have been misled in the direction suggested.

The same instructions are further objected to on the alleged ground that, instead of the question submitted, the jury should have been re-

quired to say whether or not the master, in the exercise of ordinary care, ought to have anticipated that the servant would go to the place, of injury,—if yes, whether or not that place was reasonably safe. But these were questions which the jury could have been required to determine only upon the assumption that the servant was in the line of his duties when injured. We have already held that they were rightly left to decide whether he was so or not.

The judgment of the Circuit Court is affirmed, and the defendant in error recovers its costs of appeal.