# TEXAS AND PACIFIC RAILWAY COMPANY *v.* ARCHIBALD.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH
CIRCUIT.

No. 207.  Submitted April 15, 1898.—Decided May 23, 1898.

It is the duty of a railroad company to use reasonable care to see that the
cars employed on its road, both those which it owns and those which it
receives from other roads, are in good order and fit for the purposes for
which they are intended, and this duty it owes to its employés as well
as to the public.

An employé of a railroad company has a right to rely upon this duty be-
ing performed, as, while in entering the employment he assumes the
ordinary risks incident to the business, he does not assume the risk aris-
ing from his employer's neglect to perform the duties owing to him with
respect to the appliances furnished.

THE case is stated in the opinion.

*Mr. John F. Dillon, Mr. Winslow S. Pierce* and *Mr. David
D. Duncan* for plaintiff in error.

*Mr. James Turner* and *Mr. J. Henry Shepherd* for defend-
ant in error.

MR. JUSTICE WHITE delivered the opinion of the court.

This suit, commenced in a state court, was removed to the
Circuit Court of the United States for the Eastern District of
Texas, on the ground that the defendant was incorporated
under the laws of the United States. The object of the

action was to recover damages for a personal injury suffered by the plaintiff whilst engaged as a switchman in the employ of defendant. On the trial by a jury there was a verdict in favor of the plaintiff, and the judgment of the trial court entered on such verdict was subsequently affirmed by the Circuit Court of Appeals for the Fifth Circuit. (41 U. S. App. 567.) To that court error was prosecuted.

The errors assigned are based entirely on the theory that the trial court erred in refusing to give to the jury certain instructions asked by the defendant, and that the Court of Appeals also fell into error in affirming the action of the trial court. To clearly understand the contentions of the plaintiff in error it becomes essential to outline the facts.

The Texas Pacific and the Cotton Belt Railway Companies both had tracks entering the city of Shreveport. These tracks of the two companies were connected. A short distance off the line of the Texas Pacific there was a cotton seed oil mill, which was united by a spur track with the main line of railroad, as it ran through a railway yard. The Cotton Belt delivered to the Texas Pacific two oil tank cars in order that they might be by the latter delivered to the oil mill, where they were to be filled and then redelivered by the Texas Pacific to the Cotton Belt to be carried to their point of destination over its line. The tank cars were placed by the Texas Pacific near the oil mill on the spur track leading thereto. At a subsequent time — there being conflict in the testimony as to how long a period intervened — one of the tank cars having been filled with oil, the mill company requested that the loaded car be moved and the empty car be left on the spur track so that it might also be filled. To accomplish this purpose an engine, with a box car, moved down the spur track to couple to the oil cars, so as to place the loaded one on the main track preparatory to delivering it to the Cotton Belt. The plaintiff, a switchman, was ordered to uncouple the loaded from the empty tank car. These cars were both fitted with an appliance by which, if in good order, the coupling pin could be removed by a lever without the necessity of the switchman going between them. This appli-

ance, however, on the cars in question, when the switchman sought to use it, was found to be out of order, and he was therefore compelled to lean in between the two cars to draw out the coupling pin for the purpose of uncoupling, an operation shown to be usually resorted to when necessary. As he was making this movement his feet became entangled, and he was thereby suddenly exposed to the risk of being thrown between the cars and to the danger of being crushed to death. The entanglement of the feet of the switchman was caused by a broken brake rod, with links of chain attached to it and a hook at its end, which was hanging down under one of the cars, and which, in the movement of the car, was projected out into the space between the two cars, and caught the feet and legs of the switchman as he leaned between the cars for the purpose of doing the uncoupling. In his effort to escape being thrown between the slowly moving cars the right arm of the switchman was caught between the drawheads of the cars and was so badly crushed at the elbow that amputation was rendered necessary.

There was proof tending to show that the Texas Pacific inspected the cars in use on its road, not only those belonging to it but those delivered to it from other roads, and that where a car was found out of order the inspector marked upon it the nature of the defect found to exist, thereby giving warning on the subject to those who might handle it. The uncontradicted proof was that there were no marks on the cars in question calling attention to any defect. There was proof tending to explain the absence of a mark or marks calling attention to the defective condition, by showing that the car inspector of the Texas Pacific performed his duty at a point called the junction, which was outside of the place where the tracks of the Texas Pacific and Cotton Belt were connected; and hence that where a car was delivered by the Cotton Belt to the Texas Pacific by means of the connecting track inside of the junction no inspection of such cars was made by the Texas Pacific. The proof tended to establish that this was only necessarily the case where the car delivered by the Cotton Belt to the Texas Pacific, was by the

Texas Pacific redelivered to the Cotton Belt by means of the connecting tracks between the two roads, because when a car was so redelivered it was not carried by the Texas Pacific over its main track to the junction where the car inspector was presumed to discharge his duties. In case of cars delivered as above stated, and which were not therefore. inspected by the Texas Pacific, there was proof giving rise to the inference that that company, in view of the fact that the cars were not intended to go out over its line, relied on the inspection which it presumed had been made by the Cotton Belt. The tendency of the proof on the foregoing subject was not, however, entirely concordant, as there was some proof tending to show that the duties of the car inspector of the Texas Pacific extended not only to the inspection of cars at the junction, but also to the inspection of cars received within that point under conditions similar to those under which the oil tank cars were received.

There are six assignments of error, the first of which may be at once dismissed from view, as it simply avers that the Court of Appeals erred in affirming the judgment of the trial court, without any specification of any particular error committed. The remaining five we will consider in their logical sequence, rather than in the order in which they are pressed in the brief of counsel. The consideration of the fourth and fifth assignments involves substantially the same legal contention. The fourth rests upon the refusal of the trial judge to give the following instruction:

"The duty to inspect cars coming from other roads applies only when the car is to be sent out on the receiving road, and does not apply when cars are switched from one road to be loaded and returned to the road from which they were received."

The fifth upon a like refusal to give this instruction:

"It is the duty of a railroad company to use ordinary care in keeping the cars which their employés are called on to handle in repair, so as not to expose their employés to unnecessary danger, and this duty exists to use ordinary care to inspect cars that come from other roads to be hauled over

their own roads. What is ordinary care is always measured by the facts and circumstances of the particular case, and ordinary care means more care in one case than in another. The amount of care and caution to inspect cars coming from other roads to be merely loaded and returned to the other road is not so great as when the car is to be sent out of the road of the defendant, because, in the first place, the car is to be handled only by switchmen, who have a much better opportunity to observe any defect and protect themselves than the trainmen do when a car is placed in a train and sent out on the road. Now, if the defendant used ordinary care to discover and repair defects in the car in question under the circumstances in this case, then defendant is not liable."

That it was the duty of the railway company to use reasonable care to see that the cars employed on its road were in good order and fit for the purposes for which they were intended, and that its employés had a right to rely upon this being the case, is too well settled to require anything but mere statement. That this duty of a railroad as regards the cars owned by it exists also as to cars of other railroads received by it, sometimes designated as foreign cars, is also settled. *Baltimore & Potomac Railroad Co.* v. *Mackey,* 157 U. S. 72, 91. Said the court in that case (p. 91): "Sound reason and public policy concur in sustaining the principle that a railroad company is under a legal duty not to expose its employés to dangers arising from such defects in foreign cars as may be discovered by reasonable inspection before such cars are admitted to its train." This general duty of reasonable care as to the safety of its appliances resting on the railroad, the instructions in question proposed to limit by confining its performance solely to such foreign cars as are received by a railroad "for the purpose of being hauled over its own road." In other words, the proposition is that where a car is received by a railroad only for the purpose of being locally handled, the railway as to such local business is dispensed from all duty of looking after the condition of the cars by it used, and may with complete legal impunity submit its employés to the risk arising from its neglect of duty. To

this length the proposition plainly goes, as is shown by its context, and is additionally illustrated by the argument at bar.

The argument wants foundation in reason and is unsupported by any authority. In reason, because, as the duty of the company to use reasonable diligence to furnish safe appliances is ever present, and applies to its entire business, it is beyond reason to attempt by a purely arbitrary distinction to take a particular part of the business of the company out of the operation of the general rule, and thereby to exempt it, as to the business so separated, from any obligation to observe reasonable precautions to furnish appliances which are in good condition. Indeed, the argument by which the proposition is supported is self-destructive, since it admits the general duty of the employer just stated, and affords no reason whatever for the distinction by which it is sought to take the case in hand out of its operation. The contention is without support of authority, since the cases cited to sustain it are directly to the contrary. They are: *Baltimore & Potomac Railroad Co.* v. *Mackey, supra,* and two New York cases, *Gottlieb* v. *N. Y., Lake Erie &c. Railroad,* 100 N. Y. 462, *Goodrich* v. *New York Central &c. Railroad,* 116 N. Y. 398, both of which were cited approvingly in the *Mackey case.* The theory upon which in the argument at bar it is claimed that the cases cited overthrow the very doctrine which in truth they announce, is based upon the use of the words in the *Mackey case,* "admitted into its train." Taking this as a premise, it is said the duty of a railroad to exercise reasonable diligence to furnish safe appliances exists only as to cars "admitted into its train," that is, cars which it receives and transports in one of its trains, and does not obtain as to cars which it receives and handles in its yards for local purposes only. It is obvious from a mere casual reading of both the *Mackey case* and the New York cases relied upon that the duty on the part of the railroad which they inculcate applies to all cars used by the road in its business. In addition, the case of *Flanagan* v. *Chicago & North-western Railway,* 45 Wisconsin, 98, is cited. But that case

gives no support whatever to the proposition. There a car, which had been broken and damaged, was put upon a spur track. To repair it, it became necessary to move it, and with the knowledge that the car was broken employés of the road took charge of it to remove it to the repair shop. The ruling was that under such circumstances the employé could not recover because of the defective condition of the car, and the case therefore but illustrates the general rule already referred to.

The second and third requests to charge were as follows:

"If you believe that the defendant company had car inspectors at Shreveport, but that it was not their duty under their employment to inspect cars that came from other roads on to defendant's tracks merely for the purpose of being loaded and returned, and if the cars that plaintiff was uncoupling when he was injured had been brought from the Cotton Belt road to be loaded with oil and returned to said road, and if the plaintiff knew *or by the exercise of ordinary care could have known* that it was the custom of the defendant company not to inspect cars that were brought in, as they were, to be returned, then the plaintiff would be held to assume the risk of being injured by reason of defects in said cars, and in such case he cannot recover.

"It appears in this case that plaintiff was injured while coupling two cars that did not belong to defendant company, but had been brought from the Cotton Belt road to be loaded and returned to that road. Now, if you believe it was the custom of defendant company not to inspect or repair cars when thus brought over to be loaded and returned, and the plaintiff knew this custom *or could have known it by the exercise of ordinary care*, then he assumed the risk of being injured by any defect in said car, and cannot recover."

These requests the court gave, except in the first it omitted the words therein italicized, that is, "by the exercise of ordinary care could have known," and the second, "or could have known it by the exercise of ordinary care." The court was clearly right in striking the words from the requests. The elementary rule is that it is the duty of the employer to fur-

nish appliances free from defects discoverable by the exercise of ordinary care, and that the employé has a right to rely upon this duty being performed, and that whilst in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from the neglect of the employer to perform the positive duty owing to the employé with respect to appliances furnished. An exception to this general rule is well established, which holds that where an employé receives for use a defective appliance, and with knowledge of the defect continues to use it without notice to the employer, he cannot recover for an injury resulting from the defective appliance thus voluntarily and negligently used. But no reason can be found for and no authority exists supporting the contention that an employé, either from his knowledge of the employer's methods of business or from a failure to use ordinary care to ascertain such methods, subjects himself to the risks of appliances being furnished, which contain defects that might have been discovered by reasonable inspection. The employer on the one hand may rely on the fact that his employé assumes the risks usually incident to the employment. The employé on the other has the right to rest on the assumption that appliances furnished are free from defects discoverable by proper inspection, and is not submitted to the danger of using appliances containing such defects because of his knowledge of the general methods adopted by the employer in carrying on his business, or because by ordinary care he might have known of the methods, and inferred therefrom that danger of unsafe appliances might arise. The employé is not compelled to pass judgment on the employer's methods of business or to conclude as to their adequacy. He has a right to assume that the employer will use reasonable care to make the appliances safe and to deal with those furnished relying on this fact, subject of course to the exception which we have already stated, by which where an appliance is furnished an employé, in which there exists a defect known to him or plainly observable by him, he cannot recover for an injury caused by such defective appliance, if, with the knowledge above stated, he negligently continues

.to use it. In assuming the risks of the particular service in which he engages the employé may legally assume that the employer, by whatever rule he elects to conduct his business, will fulfil his legal duty by making reasonable efforts to furnish appliances reasonably safe for the purposes for which they are intended; and whilst this does not justify an employé in using an appliance which he knows to be defective, or relieve him from observing patent defects therein, it obviously does not compel him to know or investigate the employer's modes of business, under the penalty, if he does not do so, of taking the risk of the employer's fault in furnishing him unsafe appliances. In *Davidson* v. *Cornell*, 132 N. Y. 228, the court said:

"It is, as a general rule, true that a servant entering into employment which is hazardous assumes the usual risks of the service, and those which are apparent to ordinary observation, and, when he accepts or continues in the service with knowledge of the character of structures from which injury may be apprehended, he also assumes the hazards incident to the situation. *Gibson* v. *Erie Railway Co.*, 63 N. Y. 449; *De Forest* v. *Jewett*, 88 N. Y. 264; *Sweeney* v. *Berlin & Jones Envelope Co.*, 101 N. Y. 520; *Hickey* v. *Taaffe*, 105 N. Y. 26; 12 N. E. Rep. 286; *Williams* v. *Delaware, Lackawanna &c. Railroad*, 116 N. Y. 628. Those not obvious assumed by the employé are such perils as exist after the master has used due care and precaution to guard the former against danger. And the defective condition of structures or appliances which, by the exercise of reasonable care of the master, may be obviated, and from the consequences of which he is relieved from responsibility to the servant by reason of the latter's knowledge of the situation, is such as is apparent to his observation. *Kain* v. *Smith*, 89 N. Y. 375; *McGovern* v. *Central Vermont Railroad*, 123 N. Y. 280."

In *Missouri Pac. Railway* v. *Lehmberg*, 75 Texas, 61, 67, the court considered a refusal to give a requested instruction, that if there were "any patent defects in the engine or tank, and deceased knew, or might by ordinary diligence have known of same, and said defects caused or contributed to the

injuries complained of, the jury should find for defendants."
The court said :

" Without now considering the question whether the rule
in this respect charges an employé with knowledge of defects,
except with regard to such appliances or instruments as he is
engaged himself in using, we think it sufficient to say that the
law does not, under any circumstances, exact of him the use
of diligence in ascertaining such defects, but charges him
with knowledge of such only as are open to his observation.
Beyond that he has the right to presume, without inquiry or
investigation, that his employer has discharged his duty of
furnishing him with safe and proper instruments and appli-
ances."

Indeed, the ultimate result of the argument of the plaintiff
in error is to entirely absolve the employer from the duty of
endeavoring to supply safe appliances, since it subjects an em-
ployé to all risks arising from unsafe ones, if the business be
carried on by the employer without reasonable care, and the
employé knew or by diligence could have known, not of the
dangers incident to the business, but of the harm possibly
to result from the employer's neglectful methods.   Measured
by the principles just stated the trial court not only did not
err in striking out parts of the instructions which were asked,
but in the portions given stated the law to the jury more
favorably to the plaintiff in error than was sanctioned by true
legal principles.   The remaining assignment, the sixth, but
presents, in a changed form, the questions which we have dis-
posed of.

*Affirmed.*

Mr. Justice Brewer dissented.