## DULUTH ELEVATOR CO. v. WALLIN.

(Circuit Court of Appeals, Eighth Circuit. November 26, 1909.)

No. 3,049.

1. MASTER AND SERVANT (§ 286*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

A grain elevator owned by defendant, when filled with grain, settled and sagged over, causing a belt conveyor, which extended from the ground through the center, to tear loose some of the boards and shingles from the roof. Plaintiff, with others, was employed to load a car with grain on the south side of the building while a strong wind was blowing from the north, and was struck and injured by a board which fell upon him. There was evidence tending to show that when the men went to work there was a loose board on the roof flapping in the wind, and that it was seen by defendant's superintendent. *Held*, that such evidence warranted the submission to the jury of the question of defendant's negligence in allowing such board to remain after the men were set at work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 217*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ASSUMPTION OF RISK.

In such case plaintiff cannot be held to have assumed the risk; it not appearing that he saw or knew of the loose board, or that it was plainly observable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the Circuit Court of the United States for the District of Minnesota.

Action by Ivar Wallin against the Duluth Elevator Company. Judgment for plaintiff, and defendant brings error. Affirmed.

In November, 1905, at a siding on the line of the Great Northern Railway in the county of Kittson, Minn., called Chatham, plaintiff in error (hereinafter called the "elevator company") had constructed, owned, and operated a frame elevator about 30 feet square and about 60 feet in height. On the top of this elevator building, running east and west its entire length, there was what is called a "cupola," about 8 feet in width and height, roofed with shingles on inch boards nailed to 2x4-inch rafters. Extending from the ground

up through the building, and into the cupola, near the center, there was what is termed a "leg," through which a conveyor belt, employed in carrying the grain in the elevator, passed. This leg was in the nature of a wooden chimney about 18 inches in thickness north and south, and 48 inches in width east and west, set rigidly in a steel plate on the ground, and was not fastened to the building.

On the 14th of November, 1905, the elevator being filled with grain, and the foundation thereunder being weak on account of the wet ground on which it was located, settled under the weight, and in settling inclined to the west over the side track on which it was located to such an extent that the rigid leg, not inclining with the building, protruded through the roof of the cupola, tearing loose some of the rafters, boards, and shingles. In order to prevent the building from collapse, two holes were cut in the south side of it which permitted the grain to run out on the ground. A car was placed on the side track at the southwest corner of the building, and the superintendent of the elevator company, W. L. Beaton, went about 8 miles to a place called "Hallock," and employed a number of persons to assist in loading the grain from the ground into the car. Among the persons so employed who came to Chatham was James Wallin, a minor, about the age of 18 years. The persons so employed reached Chatham about the noon hour and soon thereafter commenced loading the grain into the car. About 3 o'clock in the afternoon, as young Wallin was engaged in carrying grain in a basket from the ground to the car, and when about 20 feet south of the elevator building, he was struck on the head, knocked senseless, and severely injured by the falling of a board, variously estimated by the witnesses at from 2½ to 5 feet in length, about 12 inches wide, with shingles and a 2x4 nailed to it. The superintendent had been at the elevator about 10 o'clock in the forenoon before going to Hallock to employ the men. Had noticed the manner in which the leg had protruded through the roof of the cupola, tearing it loose, and had instructed an employé to go on the roof and remove the loosened portions, because, as he testified, he thought them dangerous to those working around the building. Gettormson, the employé so instructed, did go to the roof of the cupola and throw down all the boards he discovered to be loose. At the time the accident occurred the wind was blowing a heavy gale from the north or west of north. There is a conflict in the evidence as to whether the superintendent returned from Hallock to Chatham in the same conveyance with the men employed to load the grain, and also as to whether any loose board or boards were known by him to remain on top of the building after Gettormson had removed those he discovered. However, there is evidence in the record, if believed by the jury, from which it was warranted in finding there was a loose board on top of the elevator flapping in the wind at the time the men from Hallock drove up to the building; that the attention of Superintendent Beaton was called to it, who remarked it was dangerous. After the accident this loose board was not seen on the top of the building.

The action was brought by the father of the injured boy to recover damages for the injury so sustained by his son, as may be done under the statutes of the state of Minnesota.

From a judgment in favor of the plaintiff, the elevator company brings error.

Morton Barrows, for plaintiff in error.

Charles Loring (H. Steenerson, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and CARLAND and POLLOCK, District Judges.

POLLOCK, District Judge (after stating the facts as above). The sole ground relied on for reversal is the refusal of the trial court to instruct a verdict for the elevator company. In support of this ground of error three contentions are presented: (1) That the evidence shows no negligence on the part of the elevator company; (2) if any such

negligence be shown from the evidence, it was not further shown to have been the proximate cause of the injury; (3) that the injured boy assumed the risk of the injury received by him.

While some claim is made in argument that the evidence fails to disclose from whence the falling board came which caused the injury, yet there can be but little, if any, doubt, from a consideration of all the evidence found in the record, it was a part of the roof of the cupola torn loose or partially loose by the action of the elevator in sinking downward and inclining to the west, pushing the leg through the roof of the cupola, tearing and breaking it. And from the position which Wallin occupied at the south of the building, and the direction from whence the wind was blowing at the time, the jury was fully warranted in finding the board came from the broken roof of the building by the action of the wind.

Again, while the evidence is conflicting, we are of the opinion the jury was warranted in finding the dangerous position in which young Wallin was placed at the work of carrying the grain into the car was known to the elevator company prior to the happening of the accident, and in the exercise of due diligence this danger should have been obviated or some precaution taken to avert it. The defendant company knew the torn and broken condition of the roof by reason of the rigid leg breaking through, and knew in such condition it was dangerous, for the representative of the company so admits in his evidence, and he also gave direction to have it remedied. From all of which it is conclusively shown the elevator company knew prior to the injury which befell young Wallin that with the wind blowing from the north an injury might befall any one working on the south side of the elevator if the portions of the roof broken and torn loose by the rigid leg pushing through were not removed.

The single question, therefore, on this branch of the case, was: Did the elevator company, through its representatives, know a broken and loose board remained on top of the elevator which might be blown therefrom after young Wallin was placed at work on the south side of the building prior to his injury? On this branch of the case the witness Saf testified as follows:

"Q. When you first came to the elevator, did you see Mr. Beaton just as you came up to the elevator? A. Yes, sir; I looked at the elevator going by there. Q. What did Mr. Beaton say about the elevator? A. He said there was a loose board on them. Q. Did you see it also? A. Yes. Q. Where was that loose board that he spoke of? A. Up on top—on top of the elevator. Q. Tell the jury what you saw about that—about the loose board. A. I saw there was a loose board, and Mr. Beaton says it was dangerous, he says— Q. Said what? A. Said it was dangerous. Q. And how was it loose? A. It was flapping in the wind. Q. What next was done after Beaton said that? A. He drove by the elevator on the south side—start to work. Q. Started to work? A. Yes, sir. Q. And what work did this James Wallin, the plaintiff's son, do? A. Carried the baskets."

The witness Nygaard testified as follows:

"Q. When you came to the elevator, what did you see? A. I see the roof was broken up on the top. Q. You saw the roof was broken on top? A. Yes. Q. What was it that was broken? Describe it, tell the jury what it was like. A. I see there was some boards sticking up there, didn't put close attention about it, but I saw that some board was sticking up there. Q. Were they fast

or loose? A. Well, sticking up there; I suppose they was loose. Q. And when was that that you saw that? A. It was just—we were coming from Hallock a little piece north of the elevator; it was pretty close to the elevator when I saw it. Q. And where did you go then? A. Well, I went over there to the south side, and I started to work * * * Q. You stated, in your direct examination, that you saw a piece sticking up? A. Yes. Q. And when you went around, after the accident, did you or did you not see that piece then, or was it gone—the one that was sticking up when you first saw it? What about that piece, was it sticking up after the accident, or was it gone? A. It was gone then."

On cross-examination the same witness testified as follows:

"Q. As you came down east you saw this piece sticking up in the roof when you were quite a distance off? A. Yes, sir. Q. Therefore you saw it on the north side of the roof? A. Yes. You see, that top on the south side was sticking up like that (indicating). Q. You mean— A. You see, that piece was broken off on the south side. Q. Was sticking up from the south side. but sticking up so you could see over the top. * * * Q. And you could see it sticking up over the peak of the roof?· A. Yes. Q. That is right? A. Yes, sir."

While it is true this testimony was denied by the superintendent of the elevator company, and while the witness Gettormson testified he removed all of the loosened portions of the roof before the arrival of the men from Hallock, yet the weight of the evidence and the credibility of the witnesses was for the consideration of the jury under proper instructions. As no complaint is made of the charge given, in this respect, in the light of the foregoing evidence, it must be held the verdict returned is supported by the evidence and must stand unless overthrown on other grounds.

Again, it is contended the injured boy by his contract of employment assumed the ordinary risks incident to his employment; therefore even if it should be admitted or determined his injury came from a source of danger of which the principal was advised, yet there may be no recovery in this case. The argument made in this behalf is: As the grain which young Wallin was employed to assist in placing in the car was let out on the ground for the purpose of relieving the structure from the heavy weight which had caused it to sink and incline, and to prevent it from entire collapse, the injured boy will be presumed to have known its dangerous and defective condition and to have assumed the risk of working where he knew or should have known of the dangers to be encountered, and Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433, 28 L. Ed. 440, and kindred cases, are cited in support of the contention made. In that case, Mr. Justice Gray, delivering the opinion of the court, said:

"The obligation of a master to provide reasonably safe places and structures for his servants to work upon does not impose upon him the duty, as towards them, of keeping a building, which they are engaged in erecting, in a safe condition at every moment of their work, so far as the safety depends upon the due performance of that work by them and their fellows."

As young Wallin was employed to assist in removing the grain from the ground alongside the elevator into the car, and as this grain had been drawn from out the elevator onto the ground after it had sunk down and inclined to the west by reason of the great weight therein, and as this was done to prevent the entire collapse and falling of the

building, had the injury received by Wallin occurred on account of the collapse of the building, in the absence of any assurance on the part of the elevator company of its safe condition, the doctrine contended for might apply, for the condition of the building in this respect was open and obvious to all, and the very necessity which gave rise to the employment of young Wallin arose out of this weakened and falling condition of the building; therefore he might be presumed to have known the defective condition of the building and the risk incurred by him in there working. However, it is not shown in this case he either knew of the damaged condition of the roof, or that such condition was plainly observable, or that from any cause he should have apprehended danger from that source. Whereas, on the other hand, the elevator company knew of the threatened danger and failed to warn him or take any precaution to protect him therefrom.

Mr. Justice Day, delivering the opinion of the court in Choctaw Oklahoma, etc., R. R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96, in speaking of the doctrine of assumption of risk, said:

"Upon this question the true test is not in the exercise of care to discover dangers, but whether the defect is known or plainly observable by the employé. Texas & Pacific Ry. v. Archibald, 170 U. S. 665 [18 Sup. Ct. 777, 42 L. Ed. 1188]."

While, as has been said, the evidence in this case is conflicting, yet, as there is found in the record sufficient, if believed by the jury, to warrant the finding made that the board which injured young Wallin in falling was loose on top of the cupola prior to the accident, which fact was known to the elevator company and unknown to Wallin, and as the wind was blowing hard from a direction which would place one working on the south side of the building, where he was directed to work, in a position to receive injury from such loosened board, and as a result of his working in such position of danger he was struck and severely injured by the board, it must be held the elevator company was negligent, that such negligence was the proximate cause of the injury sustained, and that young Wallin did not by his contract of employment assume the risk of such injury coming to him, as it did, from a source of danger of which he had no knowledge or warning, and which was not apparent or obvious to him, but was known to the elevator company.

It follows the judgment must be affirmed.