## SCHAFF v. MORRIS.  (No. 8411.)

(Court of Civil Appeals of Texas. Dallas. Dec. 11, 1920. Rehearing Denied Jan. 22, 1921.)

**1. Master and servant** ⊜⇒286(29)—**Negligence in operating dump car held question for jury.**

In an action for the death of the brakeman of a work train, evidence *held* to make a question for the jury as to the employer's negligence in not operating a dump car by air pressure, as intended by the manufacturer, instead of permitting it to close by gravity after being dumped.

**2. Master and servant** ⊜⇒137(4)—**Injury by dangerous use of dump car actionable.**

The moving of an open dump car with its side and bottom overhanging and forming a trap in which a brakeman standing at the usual distance from the track and intent upon his duties was caught and injured when it closed by gravity, instead of operating the car by air, as intended by its manufacturer, constituted actionable negligence, whether or not it constituted a violation of the duty to furnish a safe place to work.

**3. Trial** ⊜⇒360—**Unwarranted special findings disregarded, where distinct findings are made.**

When a case is submitted on special issues, and a separate and distinct finding of negligence is made by the jury in conformity with the pleadings and proof, although a different and additional finding of negligence is unwarrantedly made under a wrong but distinctly submitted issue, the valid finding should be upheld and the improper one be disregarded; the liability being the same if the improper finding be eliminated.

**4. Appeal and error** ⊜⇒1070(2) — **Error in special finding held not prejudicial, where jury also found negligence in different respect.**

Where the jury in addition to finding specially that the employer failed to furnish a brakeman a reasonably safe place to work, that in so doing it was guilty of negligence, and that such negligence was the proximate cause of his injury, also found that a dump car in the manner and circumstances in which it was

being operated was not reasonably safe, that the employer was negligent respecting such operation, and that such negligence was the proximate cause of the injury, any error in the finding of an unsafe place to work was harmless.

**5. Master and servant ⬤═➤226(2)—Risk of employer's negligence not assumed, unless known or open and obvious.**

Where the employer was derelict in his duty to a brakeman in operating a dump car in a particular method, and thereby imposed an extraordinary hazard upon the brakeman, he did not as a matter of law assume the risk, unless he was specifically informed of the danger, or unless it was so open and obvious that he must necessarily have realized and comprehended it.

**6. Master and servant ⬤═➤288(6)—Brakeman's assumption of risk jury question.**

Evidence *held* to make a question for the jury as to whether a brakeman on a work train, injured when the overhanging bottom and side of a dump car closed by gravity after dumping, realized and comprehended the danger.

Appeal from District Court, Wood County; J. R. Warner, Judge.

Action by Mrs. Sarah Morris, administratrix, against C. E. Schaff, receiver of the Missouri, Kansas & Texas Railway Company of Texas. From a judgment for plaintiff, defendant appeals. Affirmed.

Chas. C. Huff and J. M. Chambers, both of Dallas, and Dinsmore, McMahan & Dinsmore, of Greenville, for appellant.

Johnson, Edwards & Hughes, of Tyler, for appellee.

HAMILTON, J. This is a suit against appellant by appellee for the recovery of damages resulting from the killing of her husband, Guy H. Morris, who was killed while working as a brakeman in appellant's service.

On October 3, 1917, appellant, receiver of the Missouri, Kansas & Texas Railway Company of Texas, contracted in writing with T. H. Shortall for making fills upon the roadbed of the railroad adjacent to the ends of a certain bridge on a branch road extending from Greenville to Mineola. Among the provisions of the contract was one to the effect that appellant should supply the contractor for use on the work certain units of a work train, including an engine, dump cars, and spreader, for which the contractor should pay stipulated rental amounts, and that the work train and engine should be operated on the work by the men then employed by the receiver for that purpose, the contractor binding himself to reimburse appellant for wages paid them for their labor done in connection with the performance of the contract.

The train in use at the time of the occurrence upon which this suit is based consisted of four Oliver dump cars, two Western dump cars, a spreader, a locomotive and a caboose. The road at the place of the occurrence ran north and south. The caboose was at the extreme south end of the train, and was coupled to the locomotive, which was headed north, and which was coupled to the spreader, which in turn was coupled to one of the Western dump cars north of it, then came the other Western dump car in the formation of the train, and north of it were the four Oliver dump cars, completing the work train.

The train thus formed had been run out on the road on November 3, 1917, to the place where the contractor Shortall had engaged with appellant to make the fills, the dump cars having been loaded with dirt to be dumped. The train was operated exclusively by appellant's train crew under the direction of J. E. Ninski, Shortall's foreman. On the above-named date the train was stopped in a position where the one of the two Western dump cars farthest from the engine (the other and the spreader intervening between it and the engine) stood with its north end extending about to the abutment of the bridge, which projected at right angles several feet from the rails on the sides. Here this car was dumped by gravity, and its load poured out on the east side of the track.

The car was so constructed that its bottom or floor set on pivots or supports hinged along its center, the lower ends of the pivots resting on a beam built on the trucks, the body of the car being fastened to the truck frames with four chains, one at each of its corners, which held it fast in a horizontal position when carrying dirt. When it was dumped at the time above indicated the chains on the west side were released, and the load, being heavier on the east side, bore the bottom of the car down and away from the side, which seems to have remained stationary, with the exception that, by the movement of cross-arms joining it to each end of the car, it protruded outward as the bottom slanted downward. The side thus extended outward into position with relation to the bottom of the car when the latter was tilted down in unloading, so as to render the former approximately parallel instead of perpendicular to the bottom. When the bottom of the car and the side of the car came into these respective positions at the time the dirt was dumped at the end of the bridge as above indicated, either the dirt did not all slide off and free the bottom of the car, but enough remained on the edge of it to hold it down, or else the working parts hung, and the side continued to protrude, all parts of the car remaining fixed in the position they took when the dirt bore down the bottom or floor, upon the chains on the west side being disconnected. If the dirt had slid off, and,

---

⬤═➤For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

thus freed, the bottom of the car or its working parts had not hung, it was expected to right itself and reassume its carrying position by force of the greater weight of the side board or "door" bearing down on the west side; it remaining attached to the bottom while the other one, on the east, was detached and held by the cross-arms, as above indicated. Guy H. Morris, a brakeman working with the train at the time, had taken a position on the abutment of the bridge on the east side while performing his duties as brakeman. After the Western car had been dumped, as aforesaid, Ninski, Shortall's foreman in charge, ordered Morris to signal the engineer to move the train. In response to this order Morris immediately gave the signal, which was not promptly responded to by the engineer, and Morris began to walk toward the engine, continuing to signal him to put the train in motion; it appearing from the evidence before us that the signal was a "backup" signal. The engineer was on the same, the east, side of the engine, facing Morris.

As Morris walked along giving the signal, he came alongside the western dump car which had just been dumped, and, the engineer in the meantime having applied the power, the train had got into motion. As Morris walked along on the edge or shoulder of the dirt just previously emptied out of this car, the movement of the car, along with the other units of the train, released the bottom and the side or "door" from their respective positions, and they suddenly snapped together as the car was passing Morris, and his head and neck were caught between the two and the injuries thus inflicted resulted in his death. His surviving wife, the appellee, as temporary administratrix, sued appellant for the benefit of herself and her infant child for damages they sustained by Morris' death, and also for damages suffered by the deceased, it being alleged fully that he was employed in interstate commerce by appellant when he was killed.

It was substantially alleged by appellee that the death was the proximate result of appellant's negligence in two respects, as follows: First: That the Western dump car was manufactured to be operated by air, and not by hand or gravity, as it was operated on the occasion of Morris' death; that it was equipped with the apparatus for operation by air, and was intended to be so operated, so that the opening and closing of its sides in dumping dirt from it would be controlled by the engineer applying air through air lines to be run from the engineer's cab to air cylinders attached to the car, so that it would open and close only in response to the will of the engineer as he applied the air by manipulation of the air lever; that appellant, knowing this to be the intended and only safe manner of opening and closing this kind of car, did not connect it with the air line, and did not install in the cab a small and inexpensive valve necessary to the use of air in opening and closing the car, but, for the sake of small economy involving greatly increased danger and extraordinary hazard to employés, appellant required dumping by hand or gravity instead of by air, notwithstanding his duty to employés required the latter method exclusively, and the negligent failure and omission to use it directly and proximately caused Morris' death.

In this same connection it was alleged that appellant did not perform his duty to keep the dumping apparatus of the car in reasonably good working order, but negligently let it get to be and remain out of repair, defective, and incomplete, so that the parts would hang and cause the car to close at irregular and uncertain intervals.

Second. That appellant neglected to provide the brakeman Morris a safe place to perform his work, and was requiring him to engage in his labors at an unsafe place at the time of his death, and that appellant's violation of his duty to employés in this respect proximately caused the death.

Appellant answered, joining issue upon all material allegations, admitting that both Morris and appellant were engaged in interstate commerce when Morris was killed, and specially pleading contributory negligence and assumed risk. The case was submitted to a jury upon special issues, which were found against appellant. Judgment was entered for appellee in accordance with the findings made by the jury, and appellant has appealed.

Excepting complaint at the court's manner of charging on the subject of assumed risk, and refusing to give certain requested charges relating to it, the appeal embodies two, and only two, contentions, and they are these: That the evidence is quite inadequate to prove that appellant's negligence caused the accident, and that, conceding proof of appellant's negligence was attained by appellee, conclusive proof that the risk of the injury and its consequences were assumed by Morris was established by the evidence, and hence, the rule of assumed risk applying, there could legally be no recovery.

An exhaustive brief and argument presents these grounds in every minute aspect of the case with challenging force, and authorities are cited which seem strongly to support appellant's position. Abstractly and generally, both negligence and assumed risk are defined in terms of precise exactness and definiteness, but because of the quality which makes neither of them ever absolute, but always relative to the facts and circumstances of the situation to which their respective rules are to be applied, we have encountered difficulty in the enterprise of determining the effect of the evidence under the rules of law relat-

ing to negligence and assumed risk so as to be able to declare whether or not the findings of the jury in this case have any support in competent proof. A given set of facts may be sufficient to sustain a finding of negligence in a particular case, and yet the same facts may not support such conclusion in another case because of a distinction in the situation which differentiates the effect of the facts. This can also be said of assumed risk. Furthermore, the vast number of decisions in Texas and other jurisdictions contributing to the law of negligence seem to contain a contrariety of expressions, caused, it seems, by shadings of fact in the different cases, which tend to confuse the effort to dispose of the instant case by reference to precedent cases, comprehending the same determinative limits which ought here to be applied.

[1] However, we have .concluded that the evidence is potent to present an issue of fact, under the law and the charge of the court, from which the minds of 12 jurors might reasonably conclude that appellant was negligent, and that his negligence produced the injury and the damages found; and also that Morris did not assume the risk of the consequence of appellant's, negligence inflicting the injury and death.

We undertake to set forth only portions of the evidence which support our conclusion that we ought not to disturb the jury's verdict.

The evidence showed that only the two Western dump cars were made for operation by air. They were equipped for this mode of use. The four Oliver dump cars were not. The Western dump cars were considerably larger than the Oliver cars, and their sides projected out further on each side of the track. They had been used about two months in another part of Texas before they were brought to the road between Mineola and Golden, where Morris was killed. No effort to operate them with air had ever been made. The manufacturer of the Western dump cars styled them "Western Air Dump Cars."

F. C. Crain was a representative of the manufacturers of the Western dump car. He had been connected with the manufacturer a number of years. He testified as follows:

"When the car is operated by air there are two cylinders similar to air brake cylinders, only larger,' that are connected with the air hose with the air tank in the engine. There is one on the left-hand side, with the chains or cables attached. There is a piston that runs back and forth there, that goes back and forth when the air pressure is on, and the cable attached to that, and that will pull the side down. If you want it to dump the other way the air is turned into the other cylinder, and that will pull the other side down. There are just two cylinders, two separate cylinders, and there are separate cables for each side. Each cable attaches to two parts of the car on each side; that is, to each corner. As to 'how this car is operated if it is dumped by air, as to how the apparatus is put on the car, and as to how it is operated, the engineer has a valve in the engine connected with the air tank back there, which is the same tank that operates the air brakes. They throw the lever inside, and that will let the air into the inside of the car, and if they want to dump the car to the right-hand side they will let the air into the left-hand side, that will pull the piston, the air forces the piston down into the cylinder, and pulls those cables and dumps the car that way. If you want to lower the car here on this side you turn the air in the cylinder on the other side, and that pulls this rope down, pulls this cable down. Then when you go to raise it, if you want to raise it, you turn the air of the cylinder on this side of the car, and that will pull the rope or the cable that is the other side and pull them down. They were so constructed as that the air pressure was communicated direct to the bed of the car, and you put the air pressure on it and held it up there, and therefore when you wanted to dump it you released the air pressure on one side or increased it' on the other and turned it over. Therefore it was within the power of the man who operated it, when operating it by air, to put the bed back in position and close the opening by application of the air power. No; it was never intended or designed in the dumping apparatus of this car for it to be operated so that when it would not close from one cause or another the train would be moved up, and then let the motion, rattle, action, and jar of the train throw that thing up. That was never intended or designed, nor was it ever any part of the plan of this machinery. That is not what the train is moved up for. No; it was not built or designed to be operated that way.. In operating it by air, the man still has got control of that bed, whether he lets it up fast or not, and a man has got a cable on it, and has got the power that pulls the cable or holds it there. In order to clear the bed sometimes where you open it the dirt will slide off, and won't all go out, and you tell them to move it up a little so that it can run out, but while you are moving it up still the engineer, by reason of that cable and his control over it, can hold the cable so that the door will not close. He can hold it; so therefore it would not be liable of itself to come up while being moved and catch somebody if operated by air. If the engineer operated it like it was intended to be operated, it would be safer than to operate it by gravity. With the air power out and having, lost control of the opening or closing of that door, and having to let it be opened or closed by gravity it would be more dangerous to operate it without air and move it to let the dirt fall out and let it come together by its own weight. It would be safer because it would not snap together while it was being moved up there."

A. J. Waters, a witness for plaintiff, testified as follows:

"The car was supposed to be opened by air, and the cars were controlled by the engineer, and after the dirt had been dumped the engineer closed the openings automatically, which was a slow and regular process. The two

larger dumping cars were of the Western type, and were equipped to work with air, but were being worked by hand at the time of the injuries to Guy H. Morris. They are similar to the attached picture, which accurately represents the two larger dumping cars. The larger dumping cars were designed to dump the dirt by air apparatus which was operated by the engineer. When the engineer moved the air lever it would tilt the bottom of the car and let the dirt out by forcing the side of the car open. On the day and occasion when Guy H. Morris received said injuries, the two larger dumping cars were being worked by hand, because the air apparatus was out of order. The openings in the cars would close themselves when worked by hand, sometimes right away and quickly; other times hanging open until the jar of the moving train would close them, when the car would tip back into place. The cars were designed and intended to close by air, which is a slower process. The dumping apparatus of the dumping car on the day of the accident in question did not operate as they were designed to be operated, but operated by hand as previously described. The dumping apparatus was designed to be operated by air, but on the day of the accident it was in bad working order, and the opening and closing of the car was done by hand, which was irregular and uncertain. * * * The car in question was supposed to be opened by air, and the cars were controlled by the engineer, and after the dirt had been dumped the engineer closed the openings automatically, which was a slow and regular process. When in good working order and condition the cars in question were designed to close slowly and gradually when the engineer operated the lever for such purpose, this being done by air, and the opening should be closed as soon as the dumping was over. The said opening should have been closed at regular intervals. On the day of the accident the dumping apparatus of the car was being operated by hand. Some Mexican workmen would loosen the chains, the car tilted, and the dirt was released, the openings would remain open for irregular periods, sometimes closing as soon as the dirt had left the car and at other times staying open during a trip to the steam shovel; and when they did close it was very quickly at unexpected times. The dumping apparatus of the dumping cars on the day of the accident in question did not operate as they were designed to be operated, but operated by hand, as previously described. The dumping apparatus was designed to be operated by air, but on the day of the accident it was in bad working condition, and the opening and closing of the cars was being done by hand, which was irregular and uncertain. The dumping cars, when being worked by hand, were dangerous to the workmen on account of not knowing when they would close, then when they did close the suddenness of it was dangerous to the men. Sometimes the dump cars were held open by sand or gravel sifting into the parts, and they would not close until the jar of the train loosened this dirt, and of course sometimes this happened right away and sometimes after a considerable distance had been traveled by the train. When the air apparatus for dumping the cars was not being used, there was nothing to hold the car open after the dirt was out, on account of the balance, and it would go back into place quickly. The dumping cars were being operated by hand, and were not closed by air before the accident in question. In the proper operation of these cars and the car in question the openings for dumping of dirt should have been closed after the dumping of the dirt and before the car was moved, and if properly worked they would do so. Leaving them open was dangerous to the man on account of the narrow roadbed. The jerking of the train would close the cars suddenly because it loosened the gravel and sand which had sifted into the workings of the car. The Western cars did not always close, and did not close automatically, because the air apparatus was not working, and they were being operated by hand, and when the dirt released the weight they would close suddenly, and other times remain open during part of the trip. The Western cars did not close at regular intervals, and when they did close it was on an uncertain contingency that no one could see. They sometimes closed very quickly after the load was discharged, and other times closed very slowly, and what would be safe in operating them at one time would be very dangerous at another time. No man could tell when he was in safety and when he was in danger working one of them. The same is practically true of the others. In reference to them closing automatically, they were intended to and would had they been in good working order."

Other witnesses who were members of the train crew, including the conductor, the engineer, and the fireman, testified that the car which killed Morris was constructed, designed, and equipped to be operated by air.

The testimony establishes the fact that the bottom of the car, if operated by air, could be held down so as to keep it and the side from closing except in response to the will of the engineer. And there is testimony in the record to support the conclusion that by the use of the air equipment the car, when open, might be closed gradually, whereas if operated by gravity it would close suddenly, irregularly, and with uncertainty.

The evidence indicates that the brakeman when killed was in the customary, usual, and proper place for giving signals, standing the distance from the train brakemen usually and properly stand when engaged in such work. This evidence is enough to establish the conclusion that his position in relation to the train was what it should be as determined by the experience derived from carrying on the same kind of railroad work with reasonable and proper care on the part of the employers of such laborers. Besides, there is evidence in the record which tends to show that he could have stood nowhere else to perform his duties.

The evidence was such, therefore, that the jury might justly conclude from it that appellant either knew, or was under the duty to know, what deceased's position in relation to distance from the car was, and that it was

a right one, as determined by experience and the requirements of his work at the very time, and that appellant should have expected and foreseen that such position in relation to the train and to this particular car would be assumed by him in the instance of his fatal injury. And the jury could also reasonably conclude that appellant might have foreseen by the exercise of ordinary care that the bottom and the side of the car, when opened, would reach out far enough to catch and injure a brakeman standing or walking at the proper and usual distance from the train in the performance of his duties, when they closed, unless, in the exercise of reasonable care, they were opened and closed by means of the air appliances.

There being proof to show that the deceased was at the proper and usual place to discharge his duties when the accident happened, and there being proof to show that reasonable care on appellant's part would have suggested substitution of the safe method of opening and closing the car by the use of the air appliances, in compliance with the purposes and intentions of the manufacturer, instead of by gravity, and thereby providing for its opening and closing only in response to the intelligent determination of the engineer rather than by mere chance, we are not authorized to disturb the finding of the jury that appellant was negligent, however much convinced we may be that the evidence on the issue is clouded with uncertainty.

Appellant's interpretation of the evidence in its entirety relating to the closing of the car which killed Morris is to the effect that the proof of the car remaining open solely by reason of the dirt holding it down until the train moved, and not because its parts hung, is complete, and that the evidence entirely excludes the theory that the parts hung and then, becoming released, closed unexpectedly after the train started. We do not take this view of the evidence. We think it does not conclusively prove that the car was held open only by dirt on the edge of the floor holding it. However, we do not consider that it could make any difference whether the proof has this effect or not, for the reason that the facts of the case show that by the use of the air appliances the closing of the car could be prevented during such intervals as might be desired, and that by applying the air it could at any time be forced to close. And, since we cannot say, as a matter of law, that the failure of appellant to use the air equipment, under the circumstances, was not negligence, whatever held the car open at the time would not matter, because its sudden closing by reason of the failure to use the air appliance is what caused the death.

Appellant cogently urges that the rule of safe place to work cannot be invoked by appellee under the facts of this case, and in substance that those parts of the charge relating to this issue are all erroneous and harmful to him, and that there could be no legal submission of such issue, and that the finding made thereon is unauthorized.

The Supreme Court of this state has clearly stated in the case of Coca-Cola Co. v. Williams (Com. App.) 209 S. W. 396, the general rule by which to determine when the duty of the master to provide the servant a safe place to work is violated, and when an actionable case of negligence arises from the violation.

In treatment of the subject the Supreme Court uses the following language:

"This positive duty of the master has its rational and legal limits, which must be recognized and enforced. It is confined to construction or provision, and does not include operation or use. The duty is violated only when the negligent act resulting in injury pertains to the place in contradistinction to the use of the place. 'At the instant of the injury * * * every place is unsafe. The test of liability is not the safety of the place nor of machinery at the instant of injury, but the character of the duty, the negligent performance of which caused the injury.' Was the duty one having to do with the preparation, construction, or maintenance of the place, or one pertaining to the operation or conduct of the business in or the use of the place? If the former, the master has breached his positive and nondelegable duty, and is liable for an injury resulting therefrom, whether the negligence be that of a vice principal or of a fellow servant; if the latter, though he may be liable, his liability does not arise from a failure to furnish or maintain a safe place."

[2] Applying the rule as considered in that case, we do not perceive in the facts of the instant case the strict applicability contended for by appellee, and if the test of appellant's liability were to be derived from the application of this rule alone, we should feel constrained to conclude and declare, as a matter of law, that negligence does not arise from a breach of duty to provide and maintain a safe place for Morris to work. But the moving of the open car, with its overhanging and extended side, forming with the bottom, a death trap for the deceased while he stood or walked the usual and customary distance from the track, intent upon his duties, whether it was an act strictly violating the duty to provide a safe place to work or not, was nevertheless the consummation of negligence which caused the injury, because it was, under all the proof a dangerous operation, while, under some of the proof, it would have been safe if the car had been operated by air instead of gravity. The breach of duty, creating actionable negligence may be said to comprehend the continuing acts of appellant from the moment he declined to apply the equipment of the dump car for control by air until it killed the deceased. It included not merely the deadly situation which hovered over Morris at the time the open car snapped and caught him. It included as well

appellant's deliberate failure from the first to use, in the exercise of reasonable care, the equipment for the operation of the car in the way intended by its makers, declared by witnesses to be safe; and the imposing a manner of use dangerous to employés, directly and proximately bringing Morris into the perilous relations to it which eventuated in his injuries and death. We, therefore, think that independent of fine distinctions and discriminations the case does not call for a determination of whether or not any duty to maintain a place of safety in which to work was violated, but that apart from it the negligence of appellant can be said to be established by the evidence.

[3] Where the case is submitted upon special issues, and a separate and distinct finding of negligence is made by the jury in conformity with the pleadings and proof, although a different and additional finding of negligence is made unwarrantedly under a wrong, but distinctly submitted issue, the valid finding should be upheld and the improper one disregarded; the liability being the same if the latter were eliminated.

[4] The following questions were submitted to the jury upon the issue of negligence:

"First. Did the defendant furnish the deceased a reasonably safe place in which to discharge his duties as a brakeman of the work train at the time in question?

"The burden of proof is on the plaintiff to establish the negative of this issue. If the place where deceased was required to discharge his duties as brakeman of the work train was rendered extrahazardous and not reasonably safe by reason of the manner and circumstances in which the dumping apparatus of the car in question operated, or was being operated, then the fact that the dumping apparatus of this car was not being operated by the defendant, but by the contractor, should not affect your finding on this issue.

"Second. If you answer the first question No, then was the defendant guilty of negligence, as this term has been defined, in failing, if he did fail, to furnish the deceased a reasonably safe place in which to discharge his duties as brakeman of the work train? The burden of proof is on the plaintiff to establish the affirmative of this issue.

"Third. If you answer the second question Yes, then was such negligence, if any, the proximate cause of the injury from which Guy H. Morris died? The burden of proof is on the plaintiff to establish the affirmative of this issue.

"Fourth. Was the car which caught the deceased, in the manner and circumstances in which it was being operated to dump the dirt, reasonably safe for the deceased while he was discharging his duties as brakeman of said train? The burden of proof is on the plaintiff to establish the negative of this issue.

"Fifth. If you answer the fourth question No, then was the defendant guilty of negligence, as this term has been defined, in having or directing the deceased as a brakeman of the work train to work with or about the same while the dumping car in question, as part of said train, was being operated to dump the dirt in the manner shown by the evidence? The burden of proof is on the plaintiff to establish the affirmative of this issue.

"Sixth. If you answer the fifth question Yes, then was such negligence, if any, the proximate cause of the injury from which Guy H. Morris died? The burden of proof is on the plaintiff to establish the affirmative of this issue."

All these questions were answered adversely to appellant. If the first is entirely eliminated, still a positive finding of negligence remains, and hence whatever error may have inhered in the first question and answer will not be held to prejudice appellant.

We cite, without discussion, some of the authorities deemed adequate to support the opinion that negligence is established by the evidence. Currie v. M., K. & T. Ry. Co. of Texas, 101 Tex. 478, 108 S. W. 1167; Magnolia Paper Co. v. Duffie, 176 S. W. 89.

Appellant's negligence having been established by the proof, then his liability for the injuries resulting from it is determined, unless the deceased assumed the risk of such injuries.

[5] If the risk involved in Morris' work as it related to the method of closing the dump car was one ordinarily incident to his labor with the train, as contended by appellant, then, of course, there could be no liability for his death, because there would be no fault on appellant's part. In effect this is practically but another way of saying there would have been no negligence. But, it being determined that appellant was derelict of his duty to Morris, and thereby imposed an extraordinary hazard, it cannot be said, as a matter of law, that the latter assumed the risk arising from it, unless it appears that such risk was either actually or constructively known to him; that is, that he had been specifically informed of the very danger of which he became the victim, or else that it was so open and obvious that he must necessarily have realized and comprehended it, so that knowledge of this particular danger must be imputed to him.

[6] There is no proof that Morris had been told of the danger which would come to him from the sudden closing of the car while he was engaged, in the usual and proper place and manner, with his duties of signaling to the engineer. Ninski, appreciating the danger to employés generally working around the train, had warned and instructed them, but he did not recall having mentioned it to Morris. The evidence supports the conclusion that Morris had been working with the train but a very few days, and that the work had just begun on the particular part of the road where the accident happened, the first load of dirt on that portion of the work having been dumped from the car just prior to the fatal accident. A few moments before the accident Ninski, fully acquainted with the dangers attending the method of unload-

ing being used, was not conscious of the danger to Morris. Just before the occurrence he himself was in the same position relative to the moving car, and the same distance from it, as was Morris, and yet his power of observation, reinforced by his knowledge of and experience with the dangers of the method of operation, did not render him conscious of the peril he was under. This was the effect of his testimony. The engineer, looking up the side of the train from his cab, with Morris and the open car and the whole situation within his view, failed to derive from all he saw any idea that Morris was about to be caught by the outreaching side of the car above his head and entirely out of the line of his vision, while he looked where the performance of his duty seems to have required. This evidence might indicate that the particular danger of the situation was such that only a nicety of calculation, not required of Morris, under the circumstances, could reveal it and cause him to appreciate it. We therefore conclude that the question of whether or not Morris' assumed the risk was one for the jury to decide, and that their finding that Morris did not assume the risk ought not to be disturbed. Railway Co. v. Hannig, 91 Tex. 347; Railway Co. v. Turner, 99 Tex. 547, 91 S. W. 562; Railway Co. v. Tack, 61 Tex. Civ. App. 551, 130 S. W. 596; Hawley v. Railway Co., 133 Fed. 150, 66 C. C. A. 216; Harvey v. Railway Co., 166 Fed. 385, 92 C. C. A. 237; Railway Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188.

We have given consideration to all those assignments of error involving procedure with reference to the charge as given, and also with reference to the special charges refused. We deem it unnecessary to discuss those assignments. We think the charge as given substantially presented the case to the jury with clearness and fullness and in compliance with the rules of law, and accordingly such assignments of error ought to be and are overruled.

The main contentions in the case, in their final analysis, ultimately resolve themselves into the elementary question of whether or not the facts under the law sustain the judgment. Finding the facts to be sufficient for this purpose, and having concluded that there was no error of procedure in the conduct of the trial, the judgment is affirmed.

Affirmed.